UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
NORMAN SHAW,

                              Petitioner,                    **REPORT AND**
                                                             **RECOMMENDATION**
            -against-
                                                             12 Civ. 7760 (KMK) (PED)
JOSEPH SMITH,

                              Respondent.
------------------------------------------------------X


TO THE HONORABLE KENNETH M. KARAS, United States District Judge:


## I.  INTRODUCTION

On November 22, 2005, a Dutchess County jury convicted petitioner Norman Shaw

("petitioner" or "defendant") of the crimes of second degree armed robbery (N.Y. Penal Law §

160.10(2)(b)), second degree robbery (N.Y. Penal Law § 160.10(1)) and fourth degree criminal

possession of stolen property (N.Y. Penal Law § 165.45(4)).  He was sentenced on April 28,

2006 to concurrent terms of imprisonment of eighteen years to life on each of the robbery counts

(as a Persistent Violent Felony Offender pursuant to N.Y. Penal Law § 70.08) and two to four

years on the stolen property count (as a Second Felony Offender pursuant to N.Y. Penal Law §

70.06).

Presently before this Court is petitioner's *pro se* Petition for a Writ of Habeas Corpus

pursuant to 28 U.S.C. § 2254.  This petition is before me pursuant to an Order of Reference

entered December 4, 2012 (Dkt. #8).  For the reasons set forth below, I respectfully recommend

that Your Honor deny the petition in its entirety.

## II. BACKGROUND[1]

A.  The Crime

During the early morning hours of May 16, 2005, Gloria Kiss was working the overnight shift at the Mobil gas station on Route 9 and Mesier Avenue in the Village of Wappingers Falls, New York.  At approximately 1:15 a.m., a man came in to buy cigarettes, but he did not have enough money and he asked whether anybody was in the shop.  Ms. Kiss felt uneasy and called her friend, Village of Wappingers Falls police office Mark Liebermann, and asked him to come to the gas station right away.

The first man left the store.  Seconds later, while Ms. Kiss was still on the phone, another man entered the store and put a gun to her face.  The man told Ms. Kiss to give him all the money or he would kill her.  Ms. Kiss gave the man money from two registers and two hundred dollars in a plastic tube from the safe.  The man left the store and Ms. Kiss watched him enter the passenger side of a minivan, which then drove away.  After about ten minutes, Ms. Kiss went to the Village police station.

When Officer Liebermann arrived at the Mobil Station, he saw a van at the gas pumps, facing Route 9.  He also saw a black male exiting the station's store carrying a white money bag in his right hand and a handgun in his left hand.  Officer Liebermann saw the man get into the passenger side of the van, and it drove off.  As Officer Liebermann pursued the van southbound

---

[1]  Unless otherwise indicated, the information in this section is gleaned from the instant petition (Dkt. #1), respondent's Affidavit in Answer to a Petition for a Writ of Habeas Corpus ("Resp. Aff.") (Dkt. #10), petitioner's Reply Affidavit to Respondent's Answer ("Pet. Aff.") (Dkt. #18), respondent's Memorandum of Law ("Resp. Mem.") (Dkt. #20), petitioner's Reply Memorandum of Law ("Reply") (Dkt. #24), respondent's Supplemental Appendix ("Supp. App.") (Dkt. #29), respondent's Supplemental Memorandum of Law ("Supp. Mem.") (Dkt. #31) and petitioner's Reply to Respondent's Supplemental Appendix ("Supp. Reply") (Dkt. #35).

on Route 9, he notified headquarters of the armed robbery, stated the van's plate number and gave a description of one of the perpetrators: a black male, about six-foot three and 240 pounds, wearing a blue jogging suit, with black hair that was graying on the sides.  The van turned right onto East Main Street, speeding towards South Avenue.  It attempted to turn left onto South Avenue but failed to negotiate the turn, went through Zion park and crashed into a tree.  By the time Officer Liebermann reached the van, its occupants were gone.

Officer John Rogers was called into work on May 16, 2005 at approximately 1:30 a.m. After a quick briefing at the station, he drove to the scene of the crash and met with Officer Liebermann.  Officer Rogers photographed the scene and collected evidence from inside the van, including a handgun and a plastic tube containing rolled up money.  He spent between an hour and an hour and a half at the scene, then returned to the station.

New York State Police were called in to assist the Village of Wappingers Falls police in locating two or three black males suspected of armed robbery, who had fled on foot after their van had crashed near South Avenue.  Troopers Alpert, Kowalski and Orth set up a perimeter around the area of the crash.  During their patrol, Trooper Alpert heard a description over the radio of one of the perpetrators: tall, black male, wearing dark clothing.  He also heard, over 911, that the registered owner of the suspect vehicle lived at 80 Carmine Drive in Wappingers Falls.

Trooper Kowalski investigated a call from people at 28 West Academy Street who reported a person in the backyard, but he did not find anyone.  He heard a report of a suspicious person at 18 Franklindale Avenue; he and Trooper Orth headed on foot in that direction.  As they walked down Franklindale Avenue, people were on their porches and looking out windows; some of them said a black male was running through yards and down the street.  The troopers headed in the direction the people said the man had gone, and made a right turn onto Clapp

Avenue.  They walked around the side of a house and Trooper Kowalski heard a noise in the bushes on the opposite side.  The troopers turned around and walked toward the front of the house, where Trooper Kowalski saw someone run off the property and across Clapp Avenue. The troopers ran after him.

Around the same time, at approximately 2:20 a.m., Trooper Alpert was on Clapp Avenue and saw–about 150 feet from him–a tall black man in dark clothes run quickly from behind a house, across the street and into a wooded area.  Trooper Alpert drove his car over to where the man had entered the woods and parked with his headlights pointing into the woods.  Troopers Kowalski and Orth came, on foot, from the same direction as the man, and the three troopers entered the woods.  About twenty-five feet in, on a downward slope, they found a black man (whom Trooper Alpert described as tall, with black grayish hair, weighing 200 to 250 pounds and wearing dark clothing) lying on the ground, face up.  The troopers handcuffed and frisked the man; his driver's license (in his wallet recovered from his pocket) identified him as Norman Shaw, of the same address as the registered owner of the van.  By this time, Detective James Pavelock had arrived at the scene.  As the troopers escorted Mr. Shaw out of the woods, Detective Pavelock heard him say:  "Why don't you just shoot me.  I was alone.  I did it alone. No one else was with me."

Village Police Sergeant Martin Novick arrived at the location shortly thereafter.  Officer Novick initially reported to the scene of the vehicle accident, then went to 80 Carmine Drive to speak to Karyn Shaw, the registered owner of the van.  Sergeant Novick told Ms. Shaw that her vehicle had been in an accident; she invited the officer in.  Ms. Shaw stated she was the only one home, that she lived with her husband, Norman Shaw, and that her nephew (Eulis Jarratt) was staying with them.  Ms. Shaw said she had gone to bed early, and Norman and her nephew were

-4-

going to go to the gas station.  Sergeant Novick saw a picture on the counter and asked if it was Norman; Ms. Shaw said it was.

Sergeant Novick left the apartment and headed back to the police station.  He radioed headquarters and told them that the owner of the van stated that Norman could have been driving that vehicle.  A few minutes later, he heard over the radio that a person fitting Norman Shaw's description was stopped near Clapp and Franklindale Avenues.  Sergeant Novick went to that location and saw a man handcuffed outside the police car.  Sergeant Novick recognized him as the man in the picture:  Norman Shaw.  Sergeant Novick asked Mr. Shaw where Eulis was; Mr. Shaw said he did not know.  Officer Novick told the troopers that he believed, based upon a picture he had viewed in the apartment, that the person they had stopped was Norman Shaw.  Officer Novick asked the troopers to take Mr. Shaw to headquarters; Trooper Alpert transported Mr. Shaw to the police station.

At the station, while Officer Liebermann was standing by Sergeant Novick's desk, he saw a man come out the bathroom and sit down on a bench (where he was re-handcuffed).  Officer Liebermann identified him as the man he had earlier observed coming out of the Mobil station.  Sergeant Novick returned to headquarters and saw Mr. Shaw sitting on a bench in the booking room, handcuffed to the wall.  Sergeant Novick entered the booking room and processed Mr. Shaw, which included advising him of his *Miranda* rights.  At some point, Sergeant Novick stepped outside while Officer Rogers escorted Gloria Kiss to the door of the booking room.  Ms. Kiss looked in the window and identified Mr. Shaw as the man who had robbed the Mobil station.

State Police Investigator Donald Yackeren arrived at the station at approximately 6:30 a.m.  He had been advised that the gun recovered in the Mobil station robbery had been stolen in

a burglary he was investigating.  Investigator Yackeren had a conversation with Mr. Shaw about the gun burglary and Mr. Shaw's drug problem.  Mr. Shaw stated he would never hurt anyone; Investigator Yackeren asked him, if that were the case, why didn't he unload the handgun; Mr. Shaw did not respond.  Investigator Yackeren asked Mr. Shaw what he would have done if the clerk pulled out a gun; Mr. Shaw responded that he would have run.

B.  Indictment and Omnibus Motion

On May 19, 2005, by Dutchess County Indictment #59/05, petitioner was accused of the following five crimes: (1) one count of the Class B Violent Felony of Armed Robbery in the First Degree (N.Y. Penal Law § 160.15(1)); (2) one count of the Class B Violent Felony of Armed Robbery in the First Degree (N.Y. Penal Law § 160.15(4)); (3) one count of the Class C Violent Felony of Robbery in the Second Degree (N.Y. Penal Law § 160.10(1)); (4) one count of the Class C Violent Felony of Robbery in the Second Degree (N.Y. Penal Law § 160.10(2)(b)); and (5) one count of the Class E Felony of Criminal Possession of Stolen Property in the Fourth Degree (N.Y. Penal Law § 160.45(4)).  See Resp. Aff., Exh. 2.[2]

On or about June 1, 2005, petitioner was served with two CPL 710.30 notices stating that the prosecution expected to introduce at trial (1) testimony by Officer Liebermann and Gloria Kiss that they had observed petitioner at the police station and identified him as the person who

---

[2]  Hereinafter, all citations to "Exh. ___" refer to exhibits attached to respondent's Affidavit in Answer.  Respondent has provided the court with a hard copy of the Affidavit in Answer, attached to which are individually tabbed Exhibits 1-25.  Respondent's Affidavit in Answer appears on ECF as Docket #10; although Exhibits 1-25 are also accessible on ECF, due to the constraints of ECF filing they have been filed in blocks (Dkt. #10–Attachments 1-5; Dkt. #11–Attachment 1; Dkt. #12–Attachments 1-7; Dkt. #13–Attachments 1-4; Dkt. #14–Attachments 1-8) which do not correspond to the tabulated exhibits.  Because the ECF version of Exhibits 1-25 are not organized in readily-usable fashion, citations to page numbers following "Exh. ___" herein refer to page numbers as they appear in the hard copy.

committed the crimes charged and (2) evidence of the statements petitioner made to Detective

Pavelock and Investigator Yackeren.  See Exh. 4.

On or about July 21, 2005 defense counsel filed an Omnibus Motion seeking various

forms of relief, including suppression of the statements and identification testimony set forth in

the CPL 710.30 notices.  See Exh. 5, at 8-10.  By Decision and Order dated August 15, 2005, the

County Court (Hayes, J.) granted petitioner's suppression motions to the extent it ordered

pretrial hearings.  See Exh. 7, at 4.

C.  Pretrial Hearings

On August 26, 2005, the trial court commenced a combined *Huntley*[3] and *Wade*[4] hearing

to address petitioner's motions to suppress statements and identification evidence.  Shortly after

the hearing began, defense counsel argued (for the first time) that the police lacked probable

cause to arrest Mr. Shaw; the trial court expanded the proceedings to include a *Dunaway*[5]

hearing to determine whether petitioner had been taken into custody illegally.  The following is a

summary of  testimony given at the August 26, 2005 hearing and at the continued hearings on

October 4 and October 6, 2005.

---

[3] People v. Huntley, 15 N.Y.2d 72, 204 N.E.2d 179, 255 N.Y.S.2d 838 (1965).  At a *Huntley* hearing, the prosecution has the burden of proving that the statements at issue were voluntary and, thus, admissible.  See id. at 78, 204 N.E.2d 179, 183, 255 N.Y.S.2d 843-44.

[4] United States v. Wade, 388 U.S. 218 (1967).  "The purpose of a *Wade* hearing is to determine before the trial whether pretrial identification procedures have been so improperly suggestive as to taint an in-court identification."  Lynn v. Bliden, 443 F.3d 238, 248 (2d Cir. 2006) (citations omitted).

[5] Dunaway v. New York, 442 U.S. 200 (1979).

1.  <u>Officer Mark Liebermann</u> (H. 2-44)[6]

On May 16, 2005 at approximately 1:14 a.m., Village of Wappingers Falls police officer Mark Liebermann received a call on his cell phone from an acquaintance, Gloria Kiss, who was an attendant at a Mobil Station on Route 9 and Mesier Avenue. She told him to get there right away. Officer Liebermann left his cell phone open and, as he drove to the location, he heard a male voice in the background say "Give me all your money or I will fucking kill you–you got three seconds or I am going to pull the trigger."

When Officer Liebermann arrived at the Mobil Station, he saw a Ford Windstar van parked diagonally to the gas pumps, facing Route 9. He pulled up behind the van and noted its plate number. Bright lights illuminated the entire area in front of the station and by the pumps. He also observed a black male about ten feet from him, exiting the station, carrying a white money bag in his right hand and a handgun in his left hand. The man was forty to forty-five years old, approximately six-foot three and 240 pounds, hunched over and walking with a slight distinctive limp. Officer Liebermann saw the man get into the passenger side of the van, and it drove off. The officer notified headquarters and County 911 of the armed robbery in progress, stated the van's plate number and reported that he was in pursuit southbound on Route 9. He mistakenly told dispatch there were three black males in the car, but there were only two. He also provided a description of one of the perpetrators: a black male, approximately six-three or six-four and 240 or 250 pounds, wearing a blue jump suit like a jogging suit, with black hair graying on the sides. Officer Liebermann pursued the van as it turned right onto East Main Street and headed towards South Avenue at a high rate of speed. As the van attempted to turn

---

[6] Numbers in parentheses preceded by "H." refer to pages from the transcript of the August 26, 2005 hearing.

left onto South Avenue, it failed to negotiate the turn, went through Zion park, crossed Andrews Place and crashed into a tree. By the time Officer Liebermann reached the van, its occupants were gone.

Officer Liebermann stayed and secured the scene, then went to the Mobil Station with Detective Weaver while he took some photographs. Officer Liebermann returned to the police station at approximately 3:00 or 3:15 a.m. He saw Gloria Kiss on the steps of the station and asked if she was all right. She was shaken and said she had called him from the Mobil Station because she knew something was up when the first man (who came in for cigarettes) asked if anyone else was working. She described the gunman as a black male, tall and a little older.

Inside the station, while Officer Liebermann was standing in the hallway by Detective Novick's desk, he saw a man come out of the bathroom and sit down on a bench (where he was re-handcuffed); this was the same man Officer Liebermann had earlier observed coming out of the Mobil Station. He pointed that man out at the hearing and identified him as Norman Shaw.

2. <u>Sergeant Martin Novick</u> (H. 44-60; CH. 84-96)[7]

On May 16, 2005 at approximately 1:30 a.m., Sergeant Martin Novick was called in to work; he reported to headquarters at approximately 1:40 a.m. and noticed Gloria Kiss there. From headquarters, he went to the scene of the vehicle accident; from there, he went to 80 Carmine Drive to speak to Karyn Shaw, the registered owner of the vehicle. Officer Novick asked her if she knew where her vehicle was; Ms. Shaw said she assumed it was parked outside. Officer Novick advised her that the police had found her car crashed in some bushes, and asked whether anyone else was in the house. Ms. Shaw stated she was the only one home, that she

---

[7] Numbers in parentheses preceded by "CH." refer to pages from the transcript of the continued hearings on October 4 and October 6, 2005.

lived with her husband, Norman Shaw, and that her nephew (Eulis Jarratt) was staying with them.  Ms. Shaw consented to a search of the apartment.  Officer Novick looked around the apartment and observed a picture on a shelf in the kitchen area.  He asked if the man in the picture was her husband, Norman Shaw;  Ms. Shaw said  it was.  Officer Novick asked if she knew where Norman was; Ms. Shaw said she had gone to bed early, and Norman and Eulis were going to go to the gas station.

Sergeant Novick left the apartment and notified dispatch that Norman Shaw could have been the driver of the van.  He headed back to headquarters and, a few minutes later (at approximately 2:20 a.m.), he heard on the radio that an individual had been stopped on the corner of Clapp and Franklindale Avenue.  Sergeant Novick went to that location; when he arrived, he saw state troopers, deputy sheriffs and a man in handcuffs outside of a police vehicle.  He walked up to the man and noticed he was the same man whose picture was in the apartment–Norman Shaw.  Sergeant Novick asked Mr. Shaw where Eulis was; Mr. Shaw said he did not know.  Sergeant Novick told the troopers that the man they had stopped was Norman Shaw, based upon a picture the sergeant saw in Shaw's apartment.  Sergeant Novick asked the troopers if they could transport Mr. Shaw to headquarters.  The troopers brought Mr. Shaw to the Village of Wappingers Falls Police Department.

Sergeant Novick returned to headquarters and saw Mr. Shaw sitting on a bench in the booking room.  The booking room door had a tinted window (approximately twelve inches square) which allowed people outside to look in, but prevented people inside from seeing out.  Sergeant Novick entered the booking room and began preparing the arrest report.  At approximately 3:01 a.m., he advised Mr. Shaw of his *Miranda* rights; Mr. Shaw acknowledged–after every sentence–that he understood his rights.  After receiving and

acknowledging the *Miranda* warnings, Mr. Shaw said he was looking to make a deal; Sergeant Novick responded that he cannot make a deal with him.

At some point, Sergeant Novick was asked to step outside while another officer (Jack Rogers) escorted Gloria Kiss to the door of the booking room. The door was closed; Ms. Kiss stood in front of the door, ten to twelve feet away from Mr. Shaw. Mr. Shaw was sitting on the bench, handcuffed to the wall, wearing a Tyvek jumpsuit. Ms. Kiss looked in the window for twenty or thirty seconds and said "That's him."

At approximately 6:30 a.m., state police Investigator Yackeren came to speak to Mr. Shaw. No one except Sergeant Novick spoke to Mr. Shaw between 3:01 a.m. (when the *Miranda* warnings were given) and the time Investigator Yackeren arrived.

3. <u>Trooper Shannon Alpert</u> (H. 60-77; CH. 19-38)

On May 16, 2005 at 1:20 a.m., Trooper Shannon Alpert heard a BOLO (be on the lookout) from a patrol car in the Village of Wappingers Falls who was southbound on Route 9 in pursuit of robbery suspects (two or three black males) in a minivan. Trooper Alpert drove from the state police barracks to Route 9D, where he heard a radio transmission that the vehicle had crashed at the intersection of South Avenue and West Main Street and the subjects had fled on foot. Trooper Alpert patrolled to that area and joined Trooper Kowalski and Trooper Orth. They set up a perimeter around the area of the car crash. Trooper Alpert patrolled the area for approximately an hour, during which time he heard a description over the radio of one of the perpetrators: tall, black male, wearing dark clothing. He also heard calls from area residents about noises in their backyards. Throughout the incident, he heard updated information broadcast (as it became available) over 911, including that the registered owner of the suspect vehicle lived at 80 Carmine Drive in Wappingers Falls.

At approximately 2:20 a.m., Trooper Alpert was on Clapp Avenue and saw–about 100 to 150 feet from him–a tall black man in dark clothes run quickly from behind a house, across the street and into a wooded area.  The wooded area was one to two tenths of a mile from the scene of the van crash, and 500 to 100 feet from 80 Carmine Drive.  Trooper Alpert drove his car over to where the man had entered the woods, parked with his headlights pointing into the woods and exited the vehicle.  As he parked, Troopers Kowalski and Orth came, on foot, from the same direction as the man; the three troopers entered the woods.  About twenty-five feet in, on a downward slope, they found a black man laying on the ground, face up.  He was tall, with black grayish hair, weighing 200 to 250 pounds, wearing dark pants and a dark, buttoned down shirt.[8] The man said "Kill me, kill me, just kill me."  The troopers turned the man over, handcuffed him and brought him back up the hill and out of the woods.  They patted him down and recovered a his driver's license from a wallet in his pocket; the license identified him as Norman Shaw of Carmine Drive in Wappingers Falls.  Trooper Alpert realized, based on information he had previously heard over 911, that Mr. Shaw's address matched the address of the registered owner of the van that had crashed.  Sergeant Novick arrived a few minutes later, while Mr. Shaw was standing up outside of the vehicle.  Trooper Alpert transported Mr. Shaw to the Village of Wappingers Falls Police Department.

    4. <u>Detective James Pavelock</u> (H. 77-85)

On May 16, 2005 at approximately 2:20 or 2:25 a.m., City of Beacon Detective James Pavelock was in the Village of Wappingers Falls in response to a call to assist Village officers locate two robbery suspects, described as two heavy-set black males.  Detective Pavelock was

---

[8] At the hearing, Trooper Alpert identified defendant Norman Shaw as the man in the woods that night.

sitting in his vehicle on Franklin Street, when he saw a heavy-set black male–about fifty to seventy-five yards away–run from a yard and across the street into the woods.  The detective immediately went to the area where he saw the man; state police officers were there.  Detective Pavelock exited his vehicle and went down an embankment, into the woods, and saw a heavy-set black male on the ground.[9]  As the troopers escorted the man out of the woods, Detective Pavelock heard him say "Shoot me, just leave me here; I was alone, I did it alone."

     5.  <u>Investigator Donald Yackeren</u> (H. 85-89)

On May 16, 2005, State Police Investigator Donald Yackeren learned that a handgun stolen during a burglary he had previously investigated had been recovered earlier that morning in conjunction with an armed robbery in the Village of Wappingers Falls.  Investigator Yackeren arrived at the Village of Wappingers Falls Police Department at approximately 6:30 a.m. and spoke to Detective Novick and other police officers.  At approximately 7:00 a.m., Investigator Yackeren spoke to Norman Shaw and explained that he was investigating burglaries during which handguns were stolen.  Mr. Shaw indicated that he knew who carried out those burglaries.  He also mentioned he had a drug problem and said he would never hurt anybody.  Detective Yackeren asked him why, then, had he not unloaded the handgun; Mr. Shaw did not directly answer but reiterated he would not have hurt anybody.  Detective Yackeren asked Mr. Shaw what he would have done if the clerk had pulled out a handgun; he said "I'd have just run."

     6.  <u>Jeff Noonan</u> (CH. 2-8)

During the early morning of May 16, 2005, Jeff Noonan was working at Dutchess County 911 as Acting Senior Dispatcher.  At approximately 1:18 a.m., Wappingers Falls police

---

    [9]  Detective Pavelock testified that he never learned the man's name, but pointed to Norman Shaw (who was sitting in the courtroom).

officer Mark Liebermann called 911 to report he was in pursuit of a robbery suspect. Shortly

thereafter, a man called 911 from 28 West Academy Street in the Village of Wappingers Falls

and reported someone was in his backyard. He called a second time and said he believed the

person was still there. Mr. Noonan notified the police dispatcher of the reported person in the

backyard; the dispatcher broadcast the information over Dutchess County 911 police radio.

    7. <u>Michael Sisia</u> (CH. 8-19)

    Michael Sisia was employed by the Village of Wappingers Falls as a police dispatcher.

During his shift on May 16, 2008, at approximately 1:17 a.m., he received a radio transmission

from Officer Mark Liebermann, who stated he had received a call from the worker at the Mobil

station about a disturbance and he was en route to that location. When Officer Liebermann

arrived at the scene, he notified Mr. Sisia that there was a robbery in progress, gave him a

description of the suspect (a black male in possession of a handgun) and the vehicle and stated

that it was headed southbound on Route 9. Officer Liebermann broadcast that information on

911. Mr. Sisia then heard over 911 that the vehicle had crashed. Officer Liebermann provided

the license number of the vehicle to Mr. Sisia, who entered it into the Village and State Police

information databases and discovered the vehicle was registered to Karyn Shaw of 80 Carmine

Drive in Wappingers Falls. He radioed the registered owner information to Officer Liebermann

and stated that information directly to Detective Novick when he arrived at headquarters at

approximately 1:30 a.m.

    At some point during the incident, Officer Liebermann transmitted a more detailed

description of the suspects, which Mr. Sisia relayed to other agencies via teletype through his

computer: three males; the passenger of the vehicle being described as a black male, six foot,

weighing a hundred and ninety pounds. During the incident, Mr. Sisia received a phone call

-14-

from a resident on Franklindale Avenue who stated she saw a black male run through her back yard. Mr. Sisia radioed that information to Officer Liebermann. The Village of Wappingers Falls radio frequency is monitored by the State Police and 911.

    8. <u>Trooper Michael Kowalski</u> (CH. 38-48)

       During the early morning hours of May 16, 2005, Trooper Michael Kowalski and numerous other troopers (including Trooper Alpert) were in the area of Clapp Avenue and Franklindale Avenue to assist the Village of Wappingers Falls Police Department locate three black males suspected of armed robbery. Trooper Kowalski was paired with Trooper Orth in the car and on foot. Trooper Kowalski spoke to numerous residents in the area of Clapp and Franklindale Avenues. He investigated a call from people at 28 West Academy Street who reported a person in the backyard, but he did not find anyone. He heard a report of a suspicious person at 18 Franklindale Avenue; he and Trooper Orth headed on foot in that direction. As they walked down Franklindale Avenue, people were on their porches and looking out windows; some of them said a black male was running through yards and down the street. The troopers headed in the direction the people said the man had gone, and made a right turn onto Clapp Avenue. They walked around the left side of a single family house at or near 42 Clapp Avenue; Trooper Kowalski heard a rustling noise in the bushes on the opposite side of the house. The troopers turned around and walked toward the front of the house, where Trooper Kowalski saw someone run off the property, across Clapp Avenue and into the village dump. The troopers ran after him. About forty feet in, down a hill, they found the man on his back. Trooper Alpert told the man to show his hands and Trooper Orth handcuffed him. He was patted down, and the troopers brought the man back up the hill to the roadway.

9. <u>Gloria Kiss</u> (CH. 49-84)[10]

On May 15, 2005 at approximately 10:20 p.m., Gloria Kiss began her overnight shift at the Foam & Wash Mobil on Route 9 and Mesier Avenue in the Village of Wappingers Falls. The Mobil station consisted of a very small store with gas pumps out front. She worked inside the store, at a counter located immediately to the right of the front door. To the immediate left of the front door was door leading to a two bay garage. The store was approximately ten to fifteen feet deep, from the front door to the soda coolers in the back. The front of the store was all glass, with a glass door. The store was very brightly lit by overhead florescent lights.

On May 16, 2005 at approximately 1:15 a.m., a man came in to buy a pack of cigarettes. He said he did not have enough money for cigarettes and stalled for a minute or two, asking questions including whether anyone was working in the garage. Ms. Kiss felt uneasy and called her friend, Village of Wappingers Falls police office Mark Liebermann, and asked him to come to the Mobil Station right away. Before she could say more, the man walked out and another man immediately came in, put a gun to her face and said "Give me all your money or I'll fuckin' kill you." The gunman was standing on the other side of the counter, approximately two and a half or three feet away from Ms. Kiss. He leaned across the counter, bringing his face about a foot away from Ms. Kiss and the gun within inches of her face. Ms. Kiss was able to see the gunman's face. She described him (at the hearing) as an older black gentleman (in his fifties), with a little bit of gray hair, five-ten to six feet tall, average weight, wearing a black teeshirt, black pants and black shoes. The gunman moved around the counter until he was right next to

---

[10] Mr. Shaw waived his right to be present in the Courtroom during Ms. Kiss' testimony, in order to eliminate another opportunity for Ms. Kiss to gather his physical description (CH. 49-50).

Ms. Kiss and told her to put her phone down, which she did.  He told her she had five seconds to get the money or he would kill her.  He pointed the gun right at Ms. Kiss and kept saying "more money."  She was watching him very closely, focusing on him and the gun.  She gave him money out of both registers (most of which was in plastic envelopes) plus two hundred dollars in a plastic tube from the safe, and he left.  Just seconds before, he had noticed one of the cameras and pulled his teeshirt half way up over his face– which made no sense to Ms. Kiss because the gunman's face had been uncovered during the entire incident up to that point.  He was in the store a total of three to five minutes.  Ms. Kiss was not sure where the gunman put the money–possibly in his pockets or in his shirt–but he held some of it in his hand as he ran out.

After the gunman went out the front door, Ms. Kiss turned and looked out the back window and saw a police car.  She waited a second then went to the door and saw the man jump into the passenger side of a minivan.  The florescent lighting outside of the store was very bright and there were no shadowy areas.  The first man who had come into the store was driving the van, which had been parked at the pumps but was now pulled right up to the front door on the sidewalk.  The gunman got into the passenger side and the van sped off.  About ten minutes later, Ms. Kiss drove to the police station.

When she arrived at the police station, she took some time to calm down and then wrote some notes about the incident.  At approximately 4:00 a.m., Officer Rogers asked Ms. Kiss to look at someone and escorted her to a small, brightly lit holding room with a steel door that had a small glass cutout.  Ms. Kiss looked through the window and saw, approximately ten feet from her, a man sitting on a bench with a blanket over his head.  The man took the blanket off and sat straight up facing Ms. Kiss; she recognized him as the man who had a gun to her head a few hours earlier.  The man had black hair with graying spots and was dressed in black clothing and

-17-

black shoes.  Ms. Kiss told Officer Rogers "that was the guy."

      10.  <u>Officer John Rogers</u> (CH. 96-104)

      Village of Wappingers Falls police officer John Rogers was called into work on May 16, 2005 at approximately 1:30 a.m.  Following a quick briefing at the station, he gathered some equipment, drove to the scene of the van crash and met up with Officer Liebermann.  Officer Rogers photographed the scene and the contents of the van, then collected evidence from inside the van: a handgun; rolled up money in a plastic tube; a backpack with a flashlight inside and a hoodie-type sweatshirt.  He spent an hour or an hour and a half at the scene, then returned to the police station.  Gloria Kiss was there; she told Officer Rogers what had happened at the Mobil station.  Norman Shaw was also at the station, in the booking room.  Officer Rogers asked Ms. Kiss if she could look inside the window of the booking room and identify the subject sitting on the bench.  She agreed to; she leaned up a little, looked in the window for ten or fifteen seconds, backed off and said that was the individual that held the gun to her at the Mobil station.  Officer Rogers believed Ms. Kiss' exact words were "Yes, that's him."

D.  <u>The Hearing Court's Decision</u>

      Prior to jury selection on November 9, 2005, the County Court (Hayes, J.) issued oral rulings on plaintiff's suppression motion and advised the parties that a written decision would follow.  <u>See</u> Transcript of July Selection ("JS"), at 4-6.  Specifically, the court advised the parties of the following conclusions of law: (1) the police had reasonable suspicion to detain Mr. Shaw on Clapp Avenue; (2) once Officer Novick arrived, based on all the information available to all the officers, probable cause existed for Mr. Shaw's arrest; (3) petitioner's statements to the troopers on Clapp Avenue and to Detective Pavelock were spontaneous; (4) petitioner's statement to Investigator Yackeren was voluntary; (5) the show-up procedures at the police

station, as to Officer Liebermann and Gloria Kiss, were improper; (6) Gloria Kiss would be allowed to identify petitioner at trial because the prosecution proved the existence of an independent source for her identification; and (7) the prosecution did not prove an independent source for Officer Liebermann's identification and, therefore, he was precluded from identifying petitioner at trial.  See id. at 5-6.

In its subsequent written decision dated January 10, 2006, the County Court made extensive findings of fact (Exh. 9, at 3-17) and set forth the following conclusions of law:

(1) The totality of the information possessed by various police officers was sufficient to establish reasonable suspicion to pursue and detain Mr. Shaw (id. at 17-22);

(2) After Detective Novick arrived, based upon all of the information known to the police (including Mr. Shaw's statements at the Clapp Avenue location), there was probable cause to arrest him (id. at 22-23);

(3) Mr. Shaw's statements to the troopers ("kill me, kill me, just kill me") and Detective Pavelock ("shoot me, just leave me here, I was alone, I did it alone") were voluntary and spontaneous (id. at 23-24);

(4) Mr. Shaw's statements to Investigator Yackeren (that he would never hurt anyone and that he would have run if the clerk pulled out a gun) were made after he was advised of his *Miranda* rights and knowingly and voluntarily waived them (id. at 24-26);

(5) Gloria Kiss' and Officer Liebermann's identifications of Mr. Shaw at the police station were the product of unduly suggestive show-up procedures and, therefore, neither one would be allowed to testify at trial about their show-up identifications (id. at 26-27);

(6) Gloria Kiss was allowed to make an in-court identification of Mr. Shaw because the prosecution proved an independent source for that identification, *i.e.* that it would be based upon

-19-

her independent recollection of the incident (id. at 28-30);

(7) Officer Liebermann would not be allowed to make an in-court identification of Mr. Shaw because the prosecution did not establish an independent source for that identification (id. at 30).

E.  Trial

Following jury selection on November 9, 2005, the case proceeded to trial on November 15, 2005.  At the close of the prosecution's case, defense counsel (Miss Kilpatrick) moved "to dismiss the Indictment, dismiss the charges for failure to prosecute by the People" (T. 304).[11] The trial court responded:

> Listen, even though we have discussed it and I know where we're going, I have to keep this case moving.  Based upon the conversations [between counsel], I take it that you are moving now to dismiss the first count of the Indictment, Robbery in the First Degree, for the specific reason that there is no proof that the gun was loaded at the time of the robbery, and, to the contrary, the District Attorney essentially agrees that it was not or at least there is no proof of that, is that your motion?

(T. 304-05.)  Defense counsel answered "Yes" (T. 305).  After confirming that the prosecution did, indeed, concede that the evidence was insufficient to prove that the gun was loaded at the time of the robbery (T. 305-06), the trial court dismissed the first count of the Indictment (robbery in the first degree pursuant to N.Y. Penal Law §160.15(1)) (T. 306).  The court inquired further as to count two:

> THE COURT: With respect to the Second Count, Robbery in the First Degree, in which it is alleged that Mr. Shaw displayed what appeared to be a pistol, Miss Kilpatrick, are you essentially moving to dismiss that count also?
>
> MISS KILPATRICK: Yes.

---

[11]  Numbers in parentheses preceded by "T." refer to pages from the trial transcript.

THE COURT: On the ground that even though it is an affirmative defense that essentially the proof in the case shows that this was not a loaded weapon from which a shot could be discharged?

MISS KILPATRICK: That is correct.

THE COURT: And what you are essentially saying is that I shouldn't have to charge the jury with it because essentially this is really covered by the Fourth Count, Robbery in the Second Degree?

MISS KILPATRICK: Yes.

(T. 306-07.)  The prosecution opposed defendant's motion to dismiss the second count, on the ground that it was defendant's burden to prove the affirmative defense that the gun was not loaded (T. 307-08).  The trial court, noting that the prosecution had essentially conceded the gun was not loaded, dismissed the second count (robbery in the first degree pursuant to N.Y. Penal Law §160.15(4)) (T. 308-09).  Finally, without inviting additional argument or discussion, the trial court denied defendant's motion to dismiss the third, fourth and fifth counts (T. 309).

On November 22, 2005, the jury convicted petitioner on those counts (second degree armed robbery, second degree robbery and fourth degree criminal possession of stolen property). He was sentenced on April 28, 2006 to concurrent terms of imprisonment of eighteen years to life on each of the robbery counts (as a Persistent Violent Felony Offender pursuant to N.Y. Penal Law § 70.08) and two to four years on the stolen property count (as a Second Felony Offender pursuant to N.Y. Penal Law § 70.06).

F.  Direct Appeal

Petitioner, by and through counsel, timely appealed his conviction to the Appellate Division, Second Department on the following grounds:

1. The trial court erroneously allowed Gloria Kiss' in-court identification of petitioner;

-21-

2.  There was no probable cause to arrest petitioner and, thus, the ensuing identification should have been suppressed;

3.  Petitioner's conviction was against the weight of the evidence;

4.  The evidence was legally insufficient to establish petitioner's guilt;

5.  Trial counsel were ineffective because they failed to object to:
      a.  Officer Liebermann's testimony that the subject sitting in the station house was the person he saw running;
      b.  the prosecution showing Officer Liebermann a photo and asking whether or not the picture fairly and accurately depicted the person he saw coming out of the Mobil Station;
      c.  hearsay testimony about the substance of a call received by the State Police from the Village of Wappingers Falls Police Department regarding a gun they recovered from the robbery;
      d.  testimony about petitioner's statement to police officers that he wanted to make a deal (which was not included in the CPL 710.30 notice);
      e.  Miss Kiss' irrelevant and prejudicial testimony about the impact of the robbery on her emotional state;
      f.  Eulis Jarratt's testimony that petitioner stole two handguns from a house on May 13, 2005;
      g.  Officer Novick's testimony about a picture that was not in evidence;

6.  Petitioner's conviction should be reversed on the ground of prosecutorial misconduct, based upon the prosecution's improper and highly prejudicial questions regarding:
      a.  Officer Liebermann's identification testimony;
      b.  the effect of the robbery upon Ms. Kiss;
      c.  Investigator Yackeren's conversation with petitioner concerning why he did not unload the gun–although there was no evidence the gun was loaded at any time;
      d.  petitioner's theft of handguns–although petitioner was not charged with that burglary;
      e.  whether the victim of the gun robbery gave petitioner permission to enter the house–although there was no evidence petitioner ever entered the house;

7.  The prosecutor improperly expressed personal opinions concerning the credibility of witnesses who testified at trial;

8.  All evidence, statements and identifications should be suppressed because petitioner was illegally seized and arrested; and

9.  Petitioner's statements to police on the scene and (later) to Investigator Yackeren should have been suppressed.

Exh. 17, at 36-53.  On or about June 6, 2011, petitioner submitted a Supplemental Brief to the

Second Department (Exh. 19) wherein he raised the following claims:

> 1.  The trial court erred in determining that Gloria Kiss had an independent source for making an in-court identification of defendant which was not tainted by the improper show-up at the police station (Exh. 19, at 1-2);

> 2.  The police did not have probable cause to arrest petitioner and, therefore, his statements and the physical evidence should have been suppressed (id. at 3-10);

> 3.  Trial counsel were ineffective because they:
>     a.  failed to seek suppression of petitioner's statements to Investigator Yackeren on the ground that they were not included in the CPL 710.30 notice (id. at 12-13);
>     b.  failed to investigate defendant's claim of systematic exclusion of African-Americans from the jury pool and failed to submit a written motion challenging the racial composition of the jury pool prior to jury selection (id. at 13-16);
>     c.  failed to cite fact-specific, controlling case law or otherwise adequately move to suppress Gloria Kiss' in-court identification and petitioner's statements to police (id. at 16);
>     d.  failed to call Karyn Shaw to testify at the suppression hearing (to refute Detective Novick's claim that he viewed a photo) and–when no photo was introduced at trial–failed to move to reopen the suppression hearing on the ground that, without the photo, there could be no probable cause to arrest (id. at 17);
>     e.  failed to object to Officer Liebermann's in-court identification of petitioner in contravention of the Hearing Court's ruling (id. at 17-18);
>     f.  failed to object to testimony from Detective Novick and Officer Montfort about a photograph they allegedly viewed in the Shaw residence–even though no photo was produced at trial (id. at 18);
>     g.  failed to object when the prosecution elicited irrelevant and highly prejudicial testimony regarding petitioner's involvement in the burglary of the handguns (id. at 18-19);

> 4.  The prosecution deprived petitioner of a fair trial by mischaracterizing its deal with Eulis Jarratt in exchange for his cooperation with the District Attorney's Office regarding *numerous* crimes in which Jarratt himself had been involved (id. at 20-21);

> 5.  Petitioner's sentence on the robbery counts (as a persistent violent felony offender) violated due process because:
>     a.  his predicate 1988 sentence was illegal (because he was sentenced improperly as a second felony offender rather than as a second violent felony

-23-

offender) (id. at 22-23);

        b.  the trial court ruled that defendant's 1982 conviction was stale for *Sandoval* purposes and, therefore, it was "stale" for purposes of establishing prior violent felony offenses (id. at 24);

        c.  petitioner did not receive a persistent violent felony hearing, and the certificates of conviction proffered by the prosecution were insufficient to establish his alleged prior violent felony convictions absent additional proof that he is the same person named in those certificates (id. at 23, 25);

        d.  the trial court–instead of a jury– determined petitioner's status as a persistent violent felony offender in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (id. at 26-27); and

6.  The cumulative effect of the errors at trial deprived petitioner of a fair trial (id. at 28).

By Decision and Order dated April 26, 2011, the Second Department affirmed petitioner's conviction and sentence.  People v. Shaw, 83 A.D.3d 1101, 1101, 922 N.Y.S.2d 171, 172 (2d Dep't 2011).  Petitioner, by and through counsel, timely submitted an application for leave to appeal to the New York Court of Appeals, wherein he sought review of all of the claims raised in his initial appellate brief, *except* for his claim that trial counsel was ineffective because they failed to object to Officer Novick's testimony about a picture of petitioner that was not in evidence.  Exh. 22.  On May 23, 2011, petitioner submitted a *pro se* application for leave to appeal to the Court of Appeals, wherein he sought review of all of the claims raised in his initial and *pro se* supplemental briefs.  See Reply (Dkt. #24), at 51-56 (ECF pagination).  By letter dated May 27, 2011, the Court of Appeals acknowledged receipt of petitioner's *pro se* leave application.  See id. at 57.  The Court of Appeals denied petitioner leave to appeal on June 29, 2011.  People v. Shaw, 17 N.Y.3d 801, 952 N.E.2d 1104, 929 N.Y.S.2d 109 (2011).

G.  Collateral Proceeding

      On or about June 27, 2012, petitioner filed a Notice of Motion to Vacate the judgment of conviction pursuant to CPL 440.10, on the grounds that (1) he was denied effective assistance of

counsel, (2) he was deprived of his right of Confrontation and (3) he is actually innocent. See Exh. 24.  By letter dated July 10, 2012, the County Court, Dutchess County, returned petitioner's notice of motion to vacate because, although the notice of motion indicated petitioner had attached an affidavit in support and a memorandum of law with exhibits, none of those documents had been provided to the court. See Exh. 25.  Thus, the County Court "deem[ed] the matter a nullity." Id.

H.   The Instant Petition

On or about September 28, 2012, petitioner timely[12] filed the instant Petition for a Writ of Habeas Corpus in the Eastern District of New York (Dkt. #1); it was transferred to the Southern District of New York on October 19, 2012 (Dkt. #2).  The Petition sets forth the following grounds for habeas relief:

1.  Petitioner was denied due process because:
    a.  The state court erroneously allowed an in-court identification by Gloria Kiss based upon her independent recollection of the actual crime;
    b.  The police lacked probable cause to arrest petitioner;[13]
    c.  Because there was no probable cause to arrest petitioner, the state court should have suppressed the police station identification by Gloria Kiss;
    d.  Because there was no probable cause to arrest petitioner, the state court should have granted his motion to suppress his statements to police;
    e.  Petitioner's conviction was against the weight of the evidence;
    f.  Petitioner was erroneously sentenced as a persistent, instead of a predicate, violent felony offender.

2.  Petitioner was denied a fair trial because:
    a.  There was insufficient evidence to support his conviction;
    b.  During trial and summation, the prosecution impermissibly expressed personal opinions about the credibility of witnesses and made statements which

_____

[12]  See 28 U.S.C. § 2244(d)(1).

[13]  In his reply, petitioner acknowledges that lack of probable cause to arrest implicates the Fourth Amendment (Reply, at 21).

mischaracterized its plea arrangement with Eulis Jarratt;[14]

      c.  Had the jury observed the cumulative off-the-record errors (ineffective assistance of trial counsel, prosecutorial misconduct "and reversible error"), the trial's outcome would have been more favorable to petitioner.

3.  Petitioner received ineffective assistance of trial counsel because they failed to object to:

      a.  Officer Liebermann's testimony that the subject he saw sitting in the station house was the person he saw running;

---

[14] In his reply, petitioner sets forth additional claims of prosecutorial misconduct, arguing that the prosecution improperly: (1) elicited identification testimony from Officer Liebermann; (2) asked Gloria Kiss how the robbery affected her; (3) asked Investigator Yackeren about his conversation with petitioner regarding why he did not unload the gun – although there was no evidence the gun was loaded; (4) asked Eulis Jarratt about petitioner's role in the burglary of the handgun used during the robbery of the Mobil station – although petitioner was never accused of, or charged with, that burglary; and (5) asked the victim of the burglary (John Villani) whether he gave petitioner permission to enter the house – although there was no evidence that petitioner entered the house. See Reply (Dkt. #24), at 27-28. Although petitioner exhausted these claims on direct appeal, he did not specifically assert them in his petition and, thus, this court may decline to review them. See Ennis v. Artus, No. 09 Civ. 10157, 2011 WL 3585954, at *19 (S.D.N.Y. Aug. 12, 2011) (citing cases) (Report and Recommendation), adopted by 2012 WL 3957046 (S.D.N.Y. Sept. 10, 2012). I note that respondent reasonably assumed that petitioner sought habeas relief on the ground of prosecutorial misconduct only to the extent delineated in his petition, and tailored its opposition accordingly. See Resp. Mem., at 62-63.

      In any event, considering the record as a whole, none of the prosecutor's allegedly improper questions so undermined the fairness of the proceedings as to deprive petitioner of due process. See Jackson v. Conway, 763 F.3d 115, 146 (2d Cir. 2014). First, Officer Liebermann did not identify petitioner; he testified only that the person shown in a picture taken from the Mobil station's surveillance camera was the same person he saw coming out of the station (T. 120-21). Second, the effect of the robbery on Ms. Kiss was first brought out on cross-examination of prosecution witness Joseph Lutz (the Mobil station's manager) (T. 47, 60); on summation, defense counsel argued that the emotional impact of the robbery on Ms. Kiss rendered her testimony unreliable (T. 435-36, 438-39, 441, 444). Third, as to Investigator Yackeren's conversation with petitioner about a loaded gun, both counts of first degree robbery were dismissed (T. 304-09). Fourth, Eulis Jarratt's testimony about the burglary was relevant to the charge of criminal possession of stolen property. Finally, John Villani's testimony was relevant to the same count, and connected to Eulis Jarratt's testimony that petitioner entered a residence on Sherwood Heights (the road on which Villani lived) and came out with two suitcases containing two handguns (T. 38, 42-43, 66).

      Copies of all unpublished cases available only in electronic form cited in this Report and Recommendation have been mailed to petitioner. See Lebron v. Sanders, 557 F.3d 76, 78 (2d Cir. 2009).

   b.  the prosecution showing Officer Liebermann a picture and asking whether it fairly and accurately depicted the person he saw coming out of the Mobil station;

   c.  the hearsay testimony that the state police were told by the Village of Wappingers Falls Police Department that the serial number from a gun used in the robbery was run through a statewide computer bank and matched a gun that was stolen in another burglary the state police were investigating;

   d.  petitioner's statement to troopers that he wanted to make a deal;

   e.  Gloria Kiss' irrelevant and highly prejudicial testimony that, since the robbery, she can't sleep and has not been able to work and the robbery replays in her head over and over;

   f.  Eulis Jarratt's testimony that petitioner entered a house to steal guns;

   g.  Officer Novick's testimony about a picture that was not in evidence;

   h.  John Villani's highly prejudicial testimony about a completely unrelated burglary;[15] and

  4.  Petitioner's appellate counsel was ineffective because he failed to fully articulate the underlying facts in support of petitioner's claims on direct appeal, which required petitioner to submit a supplemental *pro se* brief.

## I.  Application for Stay of Proceedings

  By letter dated September 3, 2013 (Dkt. #26), petitioner notified the court that he had filed a writ of error coram nobis (spurred by respondent's assertion in opposition to the instant petition that petitioner's ineffective assistance of appellate counsel claim was unexhausted), attached copies of the motion and a letter from the Second Department acknowledging receipt of same, and requested that the instant petition be held in abeyance pending decision on the

---

  [15]  Petitioner only vaguely described his ineffective assistance of trial counsel claim in his habeas petition ("The cumulative effect of many instances of incompetence prejudiced petitioner and inextricably led to a guilty verdict."). In his reply, he delineated the specific grounds underlying his claim (Dkt. #24, at 29-34), all of which were exhausted on direct appeal. As stated above, the court may decline to review those claims because petitioner did not specifically raise them in his petition.  See Ennis, 2011 WL 3585954, at *19.  The court notes, however, that respondent interpreted petitioner's ineffective assistance of trial counsel claim to incorporate all of the specific underlying grounds raised on direct appeal (via counseled brief and *pro se* supplemental brief), and opposed the claim accordingly.  See Resp. Mem., at 66-73.  In light of respondent's notice of the specific bases of petitioner's ineffective assistance of trial counsel claim, the court construes that claim to incorporate the specific grounds delineated in the reply, as reflected above.

motion.[16]  By letter dated September 23, 2013 (Dkt. #27), respondent acknowledged that the

Second Department was slated to address petitioner's motion for a writ of error coram nobis on

November 1, 2013, attached copies of its answer to the motion and an affirmation from

petitioner's appellate counsel, and opposed petitioner's application for a stay on the ground that

respondent had fully addressed the merits of the claim as an alternative argument in opposition

to the instant petition.  By letter dated September 27, 2013 (Dkt. #25), petitioner reiterated his

request for a stay and attached a copy of his reply affidavit in support of his motion for a writ of

error coram nobis.

     The Second Department denied petitioner's motion on December 26, 2013.  People v.

Shaw, 112 A.D.3d 974, 976 N.Y.S.2d 891 (2d Dep't 2013).  Petitioner sought leave to appeal

that decision; the Court of Appeals denied petitioner's application on June 30, 2014.  See People

v. Shaw, 23 N.Y.3d 1025, 16 N.E.3d 1288, 992 N.Y.S.2d 808 (Table) (2014).  By letter dated

August 19, 2014 (Dkt. #28), petitioner sought leave to amend his petition to incorporate his

exhausted ineffective assistance of appellate counsel claim.  By Memo Endorsement dated

September 3, 2014 (Dkt. #28), the undersigned deemed the ineffective assistance of appellate

counsel claim set forth in Ground Four of the underlying petition to incorporate petitioner's

argument that appellate counsel was ineffective because he did not argue on direct appeal that

trial counsel was ineffective for failing to object when jury selection was conducted in chambers,

--------------------------------------------------

[16]  In his motion for a writ of error coram nobis, petitioner asserted that appellate counsel
was ineffective because he did not argue on direct appeal that trial counsel was ineffective for
failing to object when jury selection was conducted in chambers, in violation of petitioner's
right to a public trial.  See Dkt. #26, at 11-13 (ECF pagination).  This argument was not alleged in the
instant petition as a basis for petitioner's ineffective assistance of appellate counsel claim (which
was grounded solely on petitioner's complaint that appellate counsel's inadequate brief on direct
appeal required petitioner to submit a *pro se* supplemental brief).

in violation of petitioner's right to a public trial. The undersigned also directed respondent to file, by October 3, 2014, a supplemental appendix containing all briefs, decisions and orders associated with the petitioner's application for a writ of error coram nobis, and granted respondent leave to file a supplemental brief (confined to the supplemented claim) by the same date. Respondent timely filed a supplemental appendix (Dkt. #29) and supplemental memorandum of law (Dkt. #31). On November 20, 2014, petitioner filed a reply to respondent's supplemental appendix (Dkt. #35).

### III.  APPLICABLE LAW

"Habeas review is an extraordinary remedy." Bousley v. United States, 523 U.S. 614, 621 (1998) (citing Reed v. Farley, 512 U.S. 339, 354 (1994)). Before a federal district court may review the merits of a state criminal judgment in a habeas corpus action, the court must first determine whether the petitioner has complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254. If there has been procedural compliance with these statutes, the court must then determine the appropriate standard of review applicable to the petitioner's claim(s) in accordance with § 2254(d). The procedural and substantive standards applicable to habeas review, which were substantially modified by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), are summarized below.

A.  Timeliness

The AEDPA established a one-year statute of limitations for the filing of a habeas corpus petition seeking relief from a state court conviction. See 28 U.S.C. § 2244(d)(1). The one-year limitation period runs from the latest of:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Id.

The AEDPA's statute of limitations is tolled during the pendency of a properly filed application for state post-conviction relief, or other collateral review, of a claim raised in the petition.  See id. § 2244(d)(2).  The one-year limitation period is also subject to equitable tolling, which is warranted when a petitioner has shown "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)).  "The term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." Harper v. Ercole, 648 F.3d 132, 137 (2d Cir. 2011).  "To secure equitable tolling, it is not enough for a party to show that he experienced extraordinary circumstances.  He must further demonstrate that those circumstances caused him to miss the original filing deadline." Id.  Additionally, "[c]onsistent with the maxim that equity aids the vigilant, a petitioner seeking equitable tolling of AEDPA's limitations period must demonstrate that he acted with reasonable diligence throughout the period he seeks to toll." Id. at 138 (internal quotation marks and

citations omitted); see also Valverde v. Stinson, 224 F.3d 129, 134 (2d Cir. 2000) (A petitioner seeking equitable tolling must "demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances.").

B.   Procedural Default

Federal habeas corpus review of a state court's denial of a state prisoner's federal constitutional claim is barred if the state court's decision rests on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional violation, or that he is actually innocent. See Bousley, 523 U.S. at 622; Coleman v. Thompson, 501 U.S. 722, 750 (1991). See also Lee v. Kemna, 534 U.S. 362, 375 (2002); Dunham v. Travis, 313 F.3d 724, 729 (2d Cir. 2002). A procedural ground is "independent" if "the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." See Harris, 489 U.S. at 263 (internal quotation marks omitted). A procedural bar is "adequate" if it is "based on a rule that is firmly established and regularly followed by the state in question." Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006) (internal quotation and citation omitted).

In certain limited circumstances, however, "even firmly established and regularly followed state rules will not foreclose review of a federal claim if the application of the rule in a particular case is 'exorbitant.'" See Garvey v. Duncan, 485 F.3d 709, 713-14 (2d Cir. 2007) (citing Lee, 534 U.S. at 376). To this end, the Second Circuit has set forth the following "guideposts" for evaluating the adequacy of the state procedural bar in the context of "the specific circumstances presented in the case, an inquiry that includes an evaluation of the

asserted state interest in applying the procedural rule in such circumstances":

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

Cotto v. Herbert, 331 F.3d 217, 240 (2d Cir. 2003) (quoting Lee, 534 U.S. at 381-85).

C.   Exhaustion

A federal court may not grant habeas relief unless the petitioner has first exhausted his claims in state court.  O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see 28 U.S.C. § 2254(b)(1) ("[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that – (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(I) there is an absence of available corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant"); id. § 2254(c) (the petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented").  The exhaustion requirement promotes interests in comity and federalism by demanding that state courts have the first opportunity to decide a petitioner's claims.  Rose v. Lundy, 455 U.S. 509, 518-19 (1982).

To exhaust a federal claim, the petitioner must have "fairly present[ed] his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim," and thus "giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  Baldwin

v. Reese, 541 U.S. 27, 29 (2004) (internal quotation marks and citations omitted).  "Because non-constitutional claims are not cognizable in federal habeas corpus proceedings, a habeas petition must put state courts on notice that they are to decide federal constitutional claims." Petrucelli v. Coombe, 735 F.2d 684, 687 (2d Cir. 1984) (citing Smith v. Phillips, 455 U.S. 209, 221 (1982)).  Such notice requires that the petitioner "apprise the highest state court of both the factual and legal premises of the federal claims ultimately asserted in the habeas petition." Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005) (internal citation omitted).  In doing so, a petitioner need not cite chapter and verse of the Constitution; there are a number of other ways in which a petitioner may fairly apprise the state court of the constitutional nature of his claim, including: "a) reliance on pertinent federal cases employing constitutional analysis, b) reliance on state cases employing constitutional analysis in like fact situations, c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011).  A habeas petitioner who fails to meet a state's requirements to exhaust a claim will be barred from asserting that claim in federal court. Edwards v. Carpenter, 529 U.S. 446, 451 (2000).

However, "[f]or exhaustion purposes, a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997) (internal quotation omitted).  "In such a case, a petitioner no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)." Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991).  Such a procedurally barred claim may be deemed exhausted by a federal habeas court. See, e.g., Reyes, 118 F.3d at 139.  However, absent a showing of either "cause for the procedural

default and prejudice attributable thereto," Harris v. Reed, 489 U.S. 255, 262 (1989), or "actual innocence," Schlup v. Delo, 513 U.S. 298 (1995), the petitioner's claim will remain unreviewable by a federal court.

When confronted with a "mixed" petition containing both exhausted and unexhausted claims, a federal court has the following options: (1) it may stay the proceedings and hold the petition in abeyance in order to permit the petitioner to return to state court and exhaust the unexhausted claim(s); (2) it may permit the petitioner to amend the petition and excise any unexhausted claim; (3) it may dismiss without prejudice the entire petition; or (4) it may review and deny a mixed petition containing both exhausted and unexhausted claims, if those unexhausted claims are "plainly meritless." See 28 U.S.C. § 2254(b)(2); Rhines v. Weber, 544 U.S. 269, 277-78 (2005); Zarvela v. Artuz, 254 F.3d 374, 378-82 (2d Cir. 2001); Reyes v. Morrissey, No. 07 Civ. 2539, 2010 WL 2034531, at *9 (S.D.N.Y. Apr. 21, 2010) (Report and Recommendation), adopted by 2010 WL 2034527 (S.D.N.Y. May 19, 2010).

D. Standard of Review

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991). See 28 U.S.C. § 2254(a).  When reviewing petitions filed subsequent to the AEDPA's effective date, a federal court may not grant habeas relief unless the petitioner establishes that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2).  The AEDPA

-34-

deferential standard of review will be triggered if the petitioner's claim "was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); see Bell v. Miller, 500 F.3d 149, 154-55 (2d Cir. 2007). "A state court adjudicates a state prisoner's federal claim on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." Jimenez v. Walker, 458 F.3d 130, 140 (2d Cir. 2006) (quoting Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)).

A state court's decision is "contrary to" clearly established Federal law if (1) "the state court applies a rule that contradicts the governing law set forth [by the Supreme Court of the United States]" or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [Supreme Court] decisions. And an 'unreasonable application of' those holdings must be objectively unreasonable, not merely wrong; even 'clear error' will not suffice." White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted). "The critical point is that relief is available under § 2254(d)(1)'s unreasonable application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." Id. at 1706-07 (quoting Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011)) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

Finally, under the AEDPA, the factual findings of state courts are presumed to be correct.

See 28 U.S.C. §2254(e)(1); see also Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997).  The

petitioner must rebut this presumption by "clear and convincing evidence."  28 U.S.C.

§2254(e)(1).

## IV.  ANALYSIS

A.  Fourth Amendment Claims (Grounds 1(b)-(d))

As part of his first claim for habeas relief, petitioner argues that his arrest was not

supported by probable cause and, therefore, the trial court incorrectly denied his motion to

suppress his statements to police and Gloria Kiss' police station identification.[17]  Federal habeas

review of Fourth Amendment claims has been strictly limited by the Supreme Court's holding in

Stone v. Powell: "[W]here the State has provided an opportunity for full and fair litigation of a

Fourth Amendment claim, the Constitution does not require that a state prisoner be granted

federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or

seizure was introduced at his trial."  Stone v. Powell, 428 U.S. 465, 482 (1976).  See Graham v.

Costello, 299 F.3d 129, 134 (2d Cir. 2002) (Stone's "bar to federal habeas review of Fourth

Amendment claims is permanent and incurable absent a showing that the state failed to provide a

full and fair opportunity to litigate the claim").  Accordingly, habeas review of Fourth

Amendment claims is "undertaken in only one of two instances: (a) if the state has provided no

corrective procedures at all to redress the alleged [F]ourth [A]mendment violations; or (b) if the

state has provided a corrective mechanism, but the defendant was precluded from using that

mechanism because of an unconscionable breakdown in the underlying process."  Capellan v.

---

[17]  The trial court suppressed Gloria Kiss' trial testimony about her show-up identification at the police station.  See Exh. 9, at 26-27.  I therefore construe petitioner's argument to be that Gloria Kiss' in-court identification (based upon her independent recollection) should have been suppressed as fruit of the poisonous tree.

Riley, 975 F.2d 67, 70 (2d Cir. 1992).

Petitioner does not – nor could he – contend that New York failed to provide corrective procedures to redress his alleged Fourth Amendment claims. Indeed, as the Second Circuit has noted, "the federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc. Law § 710.10 *et seq.* . . . as being facially adequate." Id. at 70 n.1 (internal quotation marks and citation omitted). Additionally, nowhere does petitioner suggest that an unconscionable breakdown of the state process occurred. "[T]he focus of the inquiry as to whether there has been an unconscionable breakdown in the state corrective process is on the existence and application of the corrective procedures themselves rather than on the outcome resulting from the application of adequate state court corrective procedures." Singh v. Miller, 104 F.App'x 770, 772 (2d Cir. 2004) (quotation and citation omitted). Here, petitioner's Fourth Amendment claims were fully addressed in the pretrial *Huntley/Wade/Dunaway* hearing which included witness testimony and cross-examination. After the hearing court denied his Fourth Amendment claims (Exh. 9, at 17-23), petitioner raised them on appeal to the Second Department, which held: "Moreover, the record supports the hearing court's conclusion that the People established that the police had reasonable suspicion to stop the defendant and that reasonable suspicion ripened into probable cause to place him under arrest." People v. Shaw, 83 A.D.3d at 1102, 922 N.Y.S.2d at 172 (citation omitted). Although petitioner argues that he is entitled to habeas relief because the trial court's probable cause finding was erroneous, "a mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." Capellan, 975 F.2d at 72. Accordingly, I conclude and respectfully recommend that petitioner's Fourth Amendment claims are not cognizable on

habeas review and must be dismissed.[18]

B.  Weight of the Evidence Claim (Ground 1(e))

        Also as part of his first claim for habeas relief, petitioner argues that he was denied due process because his conviction was against the weight of the evidence.  However, "a weight-of-the-evidence argument is a pure state law claim grounded in N.Y. Crim. Proc. Law § 470.15(5) and is therefore not cognizable under federal habeas review."  Epps v. Ercole, No. 09 Civ. 4802, 2015 WL 4869218, at *2 (S.D.N.Y. Aug. 13, 2015) (citing 28 U.S.C. § 2254(a); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (habeas corpus review not available to remedy alleged errors of state law)).  Accordingly, I conclude and respectfully recommend that petitioner's weight of the evidence claim must also be dismissed as non-cognizable.

C.  Insufficient Evidence Claim (Ground 2(a))

        In Ground Two of the instant habeas petition, petitioner asserts that the evidence was insufficient to support his conviction.  He presented this argument to the Second Department on direct appeal; the Second Department rejected the claim on procedural grounds and, alternatively, on its merits:

        The defendant's challenge to the legal sufficiency of the evidence is unpreserved for appellate review (see CPL 470.05[2]; People v. Hawkins, 11 N.Y.3d 484, 491-492, 872 N.Y.S.2d 395, 900 N.E.2d 946; People v. Gray, 86 N.Y.2d 10, 629 N.Y.S.2d 173, 652 N.E.2d 919).  In any event, viewing the evidence in the light most favorable to the prosecution (see People v. Contes, 60 N.Y.2d 620, 467 N.Y.S.2d 349, 454 N.E.2d 932), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt.

People v. Shaw, 83 A.D.3d at 1102, 922 N.Y.S.2d at 173.

        New York's contemporaneous objection rule (codified at section 470.05(2) of New

_____

        [18]  "[D]enial of a habeas petition pursuant to Stone v. Powell is a denial on the merits." Graham, 299 F.3d at 134.

York's Criminal Procedure Law) "provides that, with a few exceptions not applicable here, New York appellate courts will review only those errors of law that are presented at a time and in a manner that reasonably prompted a judge to correct them during criminal proceedings." Downs v. Lape, 657 F.3d 97, 103 (2d Cir. 2011).  Thus, in order to preserve his insufficient evidence claim, petitioner was required to make a motion to dismiss at the close of the prosecution's case. See Scission v. Lempke, 784 F. Supp.2d 237, 243-44 (W.D.N.Y. 2011).  "Moreover, New York courts have consistently held that a general motion to dismiss is not sufficient to preserve the contention that the evidence at trial was insufficient to establish a specific element of the crime charged."  See id. at 244 (citing People v. Gray, 86 N.Y.2d 10, 20-22, 652 N.E.2d 919, 629 N.Y.S.2d 173 (1995)).  See also Richardson v. Greene, 497 F.3d 212, 218 (2d Cir. 2007) ("New York's highest courts uniformly instruct that to preserve a particular issue for appeal, defendant must *specifically focus on the alleged error*.") (citation omitted; emphasis added in *Richardson*).

The record here reveals that, at the close of the prosecution's case (T. 304), defense counsel made only a general motion to dismiss which did not preserve petitioner's insufficient evidence claim.  On direct appeal, although the Second Department rejected petitioner's insufficient evidence claim on its merits, it also explicitly invoked an "independent" state procedural ground (New York's contemporaneous objection rule) as a basis for its decision. Where a state court has expressly relied on a procedural default, federal habeas review is foreclosed even if the state court also addressed the merits of the federal claim.  See Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005) (federal habeas review barred where state court held claim "not preserved for appellate review" but then ruled on the merits of the claim "in any event").

The Second Circuit has consistently recognized New York's contemporaneous objection

rule as an independent and adequate state procedural rule barring habeas review. See, e.g., Whitley v. Ercole, 642 F.3d 278, 292 (2d Cir. 2011); Downs, 657 F.3d at 104; Garvey, 485 F.3d at 720; Garcia v. Lewis, 188 F.3d 71, 79 (2d Cir. 1999) (federal courts "have observed and deferred to New York's consistent application of its contemporaneous objection rules"). Further, the Appellate Division's application of CPL 470.05(2) in this case was not exorbitant. As to the first Cotto consideration, it is "meaningless to ask whether the alleged procedural violation was actually relied on in the trial court–the violation only first occurred when defendant raised an argument on appeal that he had not raised earlier." See Garvey, 485 F.3d at 719. Indeed, perfect compliance with CPL 470.05 would have given the trial court an opportunity to address head-on the issues petitioner now raises. The second Cotto consideration clearly weighs against petitioner because, as discussed above, New York case law requires compliance with the contemporaneous objection rule under the specific circumstances presented here. The third Cotto consideration similarly disfavors petitioner because, just as in Garvey, petitioner did not simply violate the "formal requirements" of CPL 470.05(2), but rather "the very essence" of the rule. See id. at 720. Moreover, petitioner's compliance would have served a legitimate purpose in that "[a]t a bare minimum, the trial court could have developed a factual record supporting its decision[s] that could then properly be reviewed on appeal." See Whitley, 642 F.3d at 290.

Because there is an adequate and independent finding by the Appellate Division that petitioner procedurally defaulted on the insufficient evidence claim he now asserts as grounds for habeas relief, petitioner must demonstrate in his habeas petition "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." See Coleman, 501 U.S.

at 750; Acosta v. Artuz, 575 F.3d 177, 184 (2d Cir. 2009).  Petitioner, however, has made no attempt to show cause or prejudice, and there is no indication that this Court's failure to address the merits of the unpreserved claims would result in a fundamental miscarriage of justice. Accordingly, I conclude, and respectfully recommend, that petitioner's procedural default bars federal habeas review of his insufficient evidence claim.[19]

D.  No Independent Source for Gloria Kiss' In-Court Identification (Ground 1(a))

In Ground One, petitioner also claims he is entitled to habeas relief because the trial court erroneously allowed an in-court identification by Gloria Kiss based upon her independent recollection of the crime.  Petitioner specifically contends that Ms. Kiss' alleged independent "recollection" of him was irrevocably tainted by the unduly suggestive police station show-up. Petitioner raised this claim on direct appeal; the Second Department denied the claim on its merits, finding that the prosecution had "established by clear and convincing evidence that the in-court identification of the defendant was based upon the witness's independent observation of the defendant during the commission of the crime."  People v. Shaw, 83 A.D.3d at 1101, 922 N.Y.S.2d at 172.

"Whether an in-court identification has a source independent of an earlier tainted identification is a mixed question of law and fact" which, on habeas review, translates to "mixed constitutional questions (*i.e.* application of constitutional law to fact)."  Young v. Conway, 698 F.3d 69, 77 (2d Cir. 2012).  Here, the Appellate Division's decision represents the last-reasoned state court decision to address petitioner's challenge to Gloria Kiss' in-court identification

_____

[19] Dismissal of a claim for habeas relief on the ground of procedural default amounts to "a disposition of the habeas claim on the merits."  See Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011).

testimony.  Accordingly, on habeas review, I must determine whether the Second Department's decision was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  See id.

"[R]eliability is the linchpin in determining the admissibility of identification testimony" following an unduly suggestive out-of-court identification.  Manson v. Brathwaite, 432 U.S. 98, 114 (1977).  The determination of whether a witness' in-court identification has reliability independent of unduly suggestive identification procedures turns on an evaluation of the totality of the circumstances, including consideration of the following factors: the witness' opportunity to view the accused at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the accused; the witness' level of certainty at the confrontation; and the time between the crime and the confrontation.  See id. at 114-17 (applying the factors set forth in Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

Here, consideration of the *Biggers* factors–in conjunction with Ms. Kiss' testimony at the pretrial hearings–reasonably supports a finding that her in-court identification of petitioner was reliable independent of the unduly suggestive police station show-up.  First, Ms. Kiss clearly had ample opportunity to observe petitioner during the course of the robbery:  The store was small and brightly lit; initially, petitioner leaned across the counter so his face was only a foot away from Ms. Kiss' face, then he moved around the counter until he was right next to her; although petitioner pulled his shirt up over half of his face just seconds before he left the store, his face had been uncovered during the entire incident up to that point; and petitioner was in the store for at least two minutes.[20]  Second, the actions of the first man aroused Ms. Kiss' suspicion and

---

[20] Ms. Kiss estimated the gunman was in the store three to five minutes, but the video surveillance indicated he was in there approximately two minutes.  See Exh. 9, at 29.

-42-

caused her to call Officer Liebermann, so that her attention was already heightened when

petitioner entered the store.  After that point, Ms. Kiss watched petitioner very closely, focusing

on him and the gun.  Third, she described the gunman (at the suppression hearing) as an older

black male in his fifties, with a little bit of gray hair, five-ten to six feet tall, average weight,

wearing a black teeshirt, black pants and black shoes.  Although her description differed slightly

from Officer Liebermann's description of the perpetrator (black male, six-three or six-four, forty

to forty-five years old, 240 to 250 pounds, black hair graying on the sides, wearing a blue jump

suit like a jogging suit), Ms. Kiss' description generally accorded with Trooper Alpert's

description of the man he found laying on the ground (black male, tall, black grayish hair,

weighing 200 to 250 pounds, wearing dark pants and a dark, buttoned down shirt).  Additionally,

according to dispatcher Michael Sisia, Officer Liebermann described the passenger in the van as

a black male, six feet tall, weighing 190 pounds.  Fourth, Ms. Kiss was sure that the man she

viewed in the police station was the man who robbed her.  Fifth, Ms. Kiss identified petitioner at

the police station approximately two and a half hours after the robbery.

In sum, considering the totality of the circumstances, Ms. Kiss' in-court identification of

petitioner was independently reliable.  Thus, the Appellate Division's finding that Ms. Kiss had

an independent source for her identification was neither contrary to, nor an unreasonable

application of, federal law.  Accordingly, I conclude and respectfully recommend that

petitioner's challenge to Ms. Kiss' in-court identification provides no basis for habeas relief.

E.  Prosecutorial Misconduct (Ground 2(b))

As part of his second claim for habeas relief, petitioner argues that he was denied a fair

trial due to prosecutorial misconduct.  Specifically, petitioner complains that the prosecutor (1)

impermissibly expressed personal opinions about the credibility of witnesses and (2) made

statements which mischaracterized his plea arrangement with Eulis Jarratt.  Petitioner exhausted

these arguments on direct appeal; the Appellate Division summarily denied relief.  People v.

Shaw, 83 A.D.3d 1101, 1103, 922 N.Y.S.2d 171, 173 ("The defendant's remaining contentions,

including those raised in his pro se supplemental brief, are without merit.").  The Appellate

Division's "summary disposition constitutes a disposition 'on the merits.'" Hawthorne v.

Schneiderman, 695 F.3d 192, 196 (2d Cir. 2012) (citing Harrington v. Richter, 131 S. Ct. at 784-

85).  Because the Appellate Division's written decision represents the last-reasoned state court

decision to address petitioner's prosecutorial misconduct claim, I must review that claim in

accordance with the deferential AEDPA review standard.  See id.

A petitioner seeking habeas relief on the ground that the prosecutor made improper

comments during trial or summation must demonstrate that the prosecutor's comments "so

infected the trial with unfairness as to make the resulting conviction a denial of due process."

Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S.

637, 643 (1974)).  Under this standard, only "egregious" prosecutorial misconduct can give rise

to a constitutional claim.  See Miranda v. Bennett, 322 F.3d 171, 180 (2d Cir. 2003) (quoting

Donnelly, 416 U.S. at 647-48).  In determining whether prosecutorial misconduct violated due

process, "[t]he habeas court must consider the record as a whole . . . because even a prosecutor's

inappropriate or erroneous comments or conduct may not be sufficient to undermine the fairness

of the proceedings when viewed in context."  Jackson v. Conway, 763 F.3d 115, 146 (2d Cir.

2014).

First, petitioner argues that the prosecutor (in his summation) improperly denigrated

petitioner's defense theory (that Norman Shaw's brother, Jerome Shaw (a.k.a. "Big Dog"),

committed the robbery) as "speculation" and "made up," and improperly argued that the

testimony of the defense witnesses was the product of their bias against the police and was "not

believable," "beyond minor inconsistency" and was "perjury" (T. 481-82, 487-89). For the most

part, the prosecution's comments were not improper under the circumstances; they were fair

comment on the evidence and were responsive to comments made by defense counsel. At the

beginning of her summation (T. 431), defense counsel stated that the jury's job "is to go through

the testimony of the witnesses and decide which statements were mere mistakes, which

statements were embellishments, and which statements were outright lies." Throughout her

summation, defense counsel attacked the credibility of the prosecution's witnesses (T. 436, 438-

39, 441-42, 444, 447-50, 452-57, 461-62, 464, 479) and portrayed the defense witnesses as

honest individuals with no motivation to lie. She also specifically stated that the prosecution's

"whole case is speculation" (T. 447), that Detective Pavelock's "testimony was embellished" (T.

450) and that Eulis Jarratt "had a clear motive to lie" (T. 479). To the extent that the

prosecution's classification of the defense witnesses' testimony as "perjury" may have been

excessive and ill-advised, it nonetheless was a fleeting remark which was, in the context of the

record as a whole, insufficient to undermine the fairness of the proceedings.

Second, petitioner complains that the prosecution made statements which

mischaracterized their plea arrangement with Eulis Jarratt. Specifically, petitioner claims he is

entitled to habeas relief because, although the prosecution acknowledged its agreement with

Eulis Jarratt in exchange for his testimony against petitioner (T. 20, 62), the prosecutor did not

disclose that Jarratt received a deal for cooperating with the District Attorney's Office regarding

*numerous* crimes in which Jarratt himself had been involved. Petitioner argues that he was

prejudiced by this nondisclosure because–had the deal been fairly characterized–it would have

supported the defense theory that (1) Jarratt was involved in numerous crimes; (2) he was the

-45-

perpetrator in the case at bar; and (3) he struck a deal with the District Attorney in order to avoid culpability and set up petitioner as the scapegoat. Petitioner's argument fails for two reasons: (1) it is inconsistent with the defense theory asserted at trial (that Jerome Shaw was the gunman and that Eulis Jarratt was afraid to implicate him) and (2) it is conclusory and unsupported; he does not point to anything in the record which would substantiate his claim about the parameters of Eulis Jarratt's deal.

In sum, based on the record as a whole, prosecutorial misconduct did not deprive petitioner of his constitutional right to a fair trial. Thus, the Appellate Division's rejection of petitioner's prosecutorial misconduct claim was neither contrary to, nor an unreasonable application of, federal law. Accordingly, I conclude and respectfully recommend that petitioner is not entitled to habeas relief on the ground of prosecutorial misconduct.

F.  Erroneous Sentence (Ground 1(f))

As part of his first claim for habeas relief, petitioner contends that he was deprived of due process because he was erroneously sentenced as a persistent violent felony offender. Petitioner specifically argues: (1) his 1988 sentence was illegal and cannot serve as a predicate violent felony; (2) the trial court ruled that petitioner's 1982 conviction was stale for *Sandoval* purposes and, therefore, it was "stale" for purposes of establishing prior violent felony offenses; (3) petitioner did not receive a persistent violent felony hearing, and the certificates of conviction proffered by the prosecution were insufficient to establish his alleged prior violent felony convictions absent additional proof that he is the same person named in those certificates; and (4) the trial court–instead of a jury– determined petitioner's status as a persistent violent felony offender in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Petitioner exhausted these claims on direct appeal; the Appellate Division rejected them on their merits. People v. Shaw,

83 A.D.3d at 1102-03, 922 N.Y.S.2d at 173.  Accordingly, on habeas review, I must apply the

deferential AEDPA review standard in evaluating petitioner's erroneous sentence claim.  See

Hawthorne, 695 F.3d at 196; Sellan, 261 F.3d at 312.

    *1.  Apprendi claim*

    New York Penal Law Article 70 sets forth two provisions governing sentencing of

certain recidivist offenders:

> A persistent violent felony offender is defined as a person who stands convicted
> of a violent felony (as defined in N.Y. Penal Law § 70.02) and has previously
> been convicted of two or more violent felonies (as defined in N.Y. Penal Law §
> 70.04(1)(b)).  Such an individual is subject to an enhanced sentencing range, with
> a maximum term of life in prison, and a minimum term fixed, based on the
> category of the offense, anywhere from twelve to twenty-five years.  N.Y. Penal
> Law § 70.08(2), (3).  A judge does not have discretion to depart from that
> enhanced range: "[w]hen the court has found . . . that a person is a persistent
> felony offender the court must impose an indeterminate sentence of imprisonment
> [as provided herein]."  Id. § 70.08(2) (emphasis added).
>
>     By contrast, subject to certain exceptions, a persistent felony offender is
> defined as a "person, other than a persistent violent felony offender . . . who
> stands convicted of a felony after having previously been convicted of two or
> more felonies."  Id. § 70.10(1)(a).  Once a defendant is determined to be a PFO,
> he may receive an indeterminate sentence corresponding to that of a class A-1
> felony, which ranges from a minimum of fifteen to twenty-five years, and a
> maximum of life in prison.  Id. §§ 70.10(2); 70.00(3)(a)(I).  However, unlike New
> York's persistent violent felony offender statute, the PFO statute does not require
> the judge to impose a sentence within that elevated range.  Instead, the decision
> whether to impose a class A-1 sentence is within the judge's discretion.  Id. §
> 70.10(2).
>
>     The PFO statute is therefore commonly referred to as the "discretionary"
> persistent felony offender statute.  It permits, but does not require, a class A-1
> sentence for certain recidivist felons.  The procedure by which a judge determines
> whether to impose a PFO sentence in a particular case is set forth in New York
> Criminal Procedure Law § 400.20.  Pursuant to that provision, the prosecution
> must first prove beyond a reasonable doubt that the defendant is a PFO–that is,
> that he has previously been convicted of two or more qualifying felonies–before
> an enhanced sentence is authorized.  See N.Y. Crim. Proc. Law § 400.20(1), (5).
> But the court is also directed to engage in a second inquiry, and to assess whether
> a PFO sentence is warranted before imposing such a sentence, taking into
> consideration the "history and character" of the defendant and the "nature and
> circumstances of his criminal conduct."  Id.

Portalatin v. Graham, 624 F.3d 69, 73-74 (2d Cir. 2010).

Petitioner argues that the enhancement of his sentence under the persistent violent felony offender statute (N.Y. Penal Law § 70.08) violated his right to a jury under *Apprendi*. In *Apprendi*, the Supreme Court struck down a New Jersey hate-crime statute which permitted the trial judge to impose an "extended term" of imprisonment if he found, by a preponderance of the evidence, that the defendant committed the crime "with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." 530 U.S. at 468-69, 497. The Court reasoned that this potential sentencing enhancement was "the functional equivalent of an element of a greater offense" which, if applied, resulted in a defendant effectively being charged, convicted and sentenced to a more serious crime without the protections of a jury trial. Id. at 483, 494 n.19, 497. Accordingly, the Court set forth the now well-settled rule: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490-91. See also United States v. Booker, 543 U.S. 220, 244 (2005) (reaffirming *Apprendi*).

Here, petitioner relies on the Second Circuit's holding in Besser v. Walsh, 601 F.3d 163 (2010) for the proposition that New York's persistent *violent* felony offender statute (N.Y. Penal Law § 70.08) violates *Apprendi*. Reply, at 43-44 (ECF pagination). In *Besser*, the Second Circuit heard consolidated appeals involving three habeas petitioners who were sentenced under New York Penal Law § 70.10, and held that New York's persistent felony offender sentencing scheme violates the Sixth Amendment and that the New York courts unreasonably applied clearly established Supreme Court precedent in holding otherwise, but remanded to the district courts for consideration of whether those errors were harmless. See Besser, 601 F.3d at 189.

-48-

However, following rehearing *en banc*, the Second Circuit vacated *Besser* and held that the New York decisions upholding the constitutionality of New York Penal Law § 70.10 did not unreasonably apply established Supreme Court precedent. See Portalatin, 624 F.3d at 90-94. Petitioner's argument is, therefore, baseless.

Moreover, petitioner was sentenced as a persistent *violent* felony offender under New York Penal Law § 70.08. Unlike New York Penal Law § 70.10, which affords judges *discretion* to impose an enhanced sentence for persistent felony offenders *based upon additional findings*, New York Penal Law § 70.08 *mandates* an enhanced sentenced based *solely* on the court's finding of qualifying prior convictions. Thus, § 70.08 clearly falls within *Apprendi*'s explicit exception that the fact of a prior conviction need not be submitted to a jury. See Apprendi, 530 U.S. at 490-91 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). The state court's rejection of petitioner's *Apprendi* claim was, therefore, neither contrary to, nor an unreasonable application of, federal law. See Mack v. Lavalley, No. 13 Civ. 8194, 2015 WL 463818, at *3 (S.D.N.Y. Feb. 4, 2015) ("Numerous habeas petitioners have asserted this claim [that N.Y. Penal Law § 70.08 violates *Apprendi*], and it has been routinely rejected."); Kelly v. Lee, No. 11-CV-3903, 2014 WL 4699952, at *13 n.12 (E.D.N.Y. Sept. 22, 2014) ("The Court notes that courts in this Circuit routinely reject *Apprendi* challenges to New York's persistent violent felony offender statute.") (citing cases). Accordingly, I conclude and respectfully recommend that petitioner's *Apprendi* challenge lacks merit and must be dismissed.

   *2. Remaining sentencing arguments*

   Petitioner's remaining arguments underlying his challenge to his sentence as a persistent

violent felony offender are similarly unpersuasive.

First, he argues that his 1982 conviction could not constitute a predicate offense because it occurred more than ten years prior and, therefore, was "stale." However, petitioner does not dispute that he was incarcerated from December 15, 1982 until August 12, 1985, and again from January 30, 1989 until December 2, 1999. See Exh. 10. Under New York law, "a defendant qualifies for sentencing as a persistent violent felony offender if he has been sentenced for at least two violent felonies (the predicate felonies) within ten years of his commission of the felony for which he faces sentencing (the sentencing felony), excluding any time that he was incarcerated between his commission of the first felony and his commission of the sentencing felony." Rodriguez v. Williamson, No. 06 Civ. 14306, 2007 WL 2274255, at *4 (S.D.N.Y. Aug. 8, 2007) (citing N.Y. Penal Law §§ 70.02, 70.04, 70.08). Here, excluding the amount of time petitioner was incarcerated, a little less than nine years had elapsed between his 1982 sentencing and his commission of the instant crime. Therefore, the 2006 sentencing court properly considered petitioner's 1982 conviction a predicate violent felony offense for purposes of adjudicating him a persistent violent felony offender.

Next, petitioner claims that his 1988 conviction was illegal and, thus, cannot serve as a predicate felony. He specifically argues:

> In the instant case at bar, the defendant was erroneously sentenced as a second felony [offender] in 1988–he should have been sentenced as a second violent felony offender. The defendant's prior 1982 sentence was Attempted Burglary in the Second Degree, a violent felony offense . . . and the 1988 sentence was Robbery in the First [D]egree . . . . Consequently, it was error as a matter of law for defendant to have been sentenced as a second felony offender in 1988 when his prior 1982 offense and the 1988 offense itself were both violent felony offenses.

Reply, at 39 (ECF pagination). Petitioner's argument is misplaced. In the course of attacking

-50-

the mistake made at his 1988 *sentencing*, petitioner concedes that he was *convicted* in 1982 and 1988 of violent felony offenses. "Because there is no dispute that petitioner had two prior violent felony convictions at the time of his instant sentencing, he was properly sentenced as a persistent violent felony offender." Adelman v. Ercole, No. 08-CV-3609, 2010 WL 3210718, at *4 (E.D.N.Y. Aug. 12, 2010) (citing People v. Carr, 244 A.D.2d 264, 664 N.Y.S.2d 766 (1997) (the fact that defendant was not sentenced on his second violent felony conviction did not prevent trial judge from sentencing defendant as a persistent violent felony offender under § 70.08)).

Finally, petitioner claims that his due process rights were violated because he did not receive a persistent violent felony hearing, and the certificates of conviction proffered by the prosecution were insufficient to establish his alleged prior violent felony convictions absent additional proof that he is the same person named in those certificates. As stated above, however, petitioner concedes that he was convicted of the predicate violent felonies at issue. In any event, petitioner's due process rights were not violated by the lack of a "hearing." Due process requires that a convicted defendant who is subject to an enhanced sentence under a recidivist statute be afforded reasonable notice and an opportunity to be heard regarding the potential predicate charge. See Specht v. Patterson, 386 U.S. 605, 610 (1967); Oyler v. Boles, 368 U.S. 448, 451-52 (1962). Here, after petitioner was convicted of two violent felonies, the prosecution filed (on or about December 12, 2005) an Amended Persistent Violent Felony Offender Statement (Exh. 10) which listed petitioner's 1988 and 1982 predicate violent felony convictions and specified the dates of petitioner's incarceration to establish that these crimes fell within the ten-year statute of limitations. On or about February 7, 2006, petitioner filed a motion challenging his sentencing as a persistent violent felony offender (Exh. 11), on the grounds that

(1) New York Penal Law § 70.08 violates *Apprendi* and (2) his prior convictions may not be relied upon as predicate convictions because he was not informed (at the time of his prior convictions) that they were each classified as a violent felony.  Petitioner's motion included his affidavit, wherein he admitted both the 1982 and 1988 convictions but argued (1) that, in 1982, he did not know he pled guilty to a violent felony and (2) he was sentenced as a predicate felon in 1988.  Petitioner also submitted a transcript of his 1988 sentencing (Exh. 12) and counsel's Memorandum of Law (Exh. 13).  The prosecution filed an Affirmation in Answer (Exh. 14).  By Decision and Order dated March 20, 2006 (Exh. 15), the County Court (Hayes, J.) rejected petitioner's arguments and adjudicated him a persistent violent felony offender pursuant to New York Penal Law § 70.08.  Thus, petitioner was clearly afforded a reasonable opportunity to controvert the validity of the prosecution's reliance upon his 1982 and 1988 convictions as a basis for his sentencing as a persistent violent felony offender.  Further, to the extent petitioner argues that he was denied a hearing in violation of New York Criminal Procedure Law § 400.16, "[i]t is well settled that claims for violation of a state procedural law do not present a federal question for which habeas relief may be granted." Adelman, 2010 WL 3210718, at *3 (quotation and citation omitted).

In sum, the Appellate Division's rejection of petitioner's sentencing claims was neither contrary to, nor an unreasonable application of, federal law.  Accordingly, I conclude and respectfully recommend that petitioner is not entitled to habeas relief on the ground that his sentence as a persistent violent felony offender violated due process.

G.  Ineffective Assistance of Counsel (Grounds 3 and 4)

In his third and fourth claims for habeas relief, petitioner argues that he was deprived of effective assistance of trial and appellate counsel.  In order to establish a claim of ineffective

assistance of counsel, petitioner must demonstrate (1) that his attorney's performance "fell below an objective standard of reasonableness" and (2) that there is a "reasonable probability" that, but for counsel's error, "the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984). "The *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001). As to *Strickland*'s first prong, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 690). Petitioner may overcome this presumption by demonstrating that "counsel's performance was unreasonably deficient under prevailing professional standards." Nosov v. United States, 526 F.App'x 127, 128 (2d Cir. 2013) (summary order) (citing Strickland, 466 U.S. at 687). The second prong focuses on prejudice to the petitioner. A habeas petitioner bears the burden of establishing *both* deficient performance and prejudice. See Greiner, 417 F.3d at 319. Thus, "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.

*1. Trial Counsel*

As his third ground for habeas relief, petitioner claims that he was deprived of effective assistance of trial counsel because they failed to lodge certain objections during trial. Specifically, petitioner complains that trial counsel failed to object to: (1) Officer Liebermann's testimony that the subject he saw sitting in the station house was the person he saw running; (2) the prosecution showing Officer Liebermann a picture and asking whether it fairly and

accurately depicted the person he saw coming out of the Mobil station; (3) the hearsay testimony that the state police were told by the Village of Wappingers Falls Police Department that the serial number from a gun used in the robbery was run through a statewide computer bank and matched a gun that was stolen in another burglary the state police were investigating; (4) petitioner's statement to troopers that he wanted to make a deal; (5) Gloria Kiss' testimony that, since the robbery, she can't sleep and has not been able to work and the robbery replays in her head over and over; (6) Eulis Jarratt's testimony that petitioner entered a house to steal guns; (7) Officer Novick's testimony about a picture that was not in evidence; and (8) John Villani's testimony about a completely unrelated burglary. Petitioner exhausted his ineffective assistance of trial counsel claim on direct appeal; the Second Department denied it on the merits. People v. Shaw, 83 A.D.3d at 1102, 922 N.Y.S.2d at 173. Accordingly, on habeas review, I must apply the deferential AEDPA review standard in evaluating petitioner's ineffective assistance of trial counsel claim. See Sellan, 261 F.3d at 312.

Petitioner claims that trial counsel was ineffective for failing to object to Officer Liebermann's testimony that the subject he saw *sitting in the station house* was the person he saw running from the Mobil station. Petitioner's account of this testimony is inaccurate; Officer Liebermann was shown a surveillance photo and testified that the individual *in the photo* was the subject he saw come out of the store with the gun and the money (T. 120). He did not state that the individual in the photo was the subject he saw sitting in the station house. Petitioner also claims that trial counsel should have objected when, immediately thereafter, Officer Liebermann was asked whether the photo fairly and accurately depicted the person he saw coming out of the Mobil station (T. 121). There was no legitimate reason for defense counsel to object to this line of questioning, and their failure to do so was, therefore, not ineffective. See United States v.

-54-

Kirsh, 54 F.3d 1062, 1071 (2d Cir. 1995) (failure to make a meritless argument does not rise to the level of ineffective assistance).

Next, petitioner argues that trial counsel was ineffective for failing to lodge a hearsay objection to the following testimony from Trooper Orth (T. 195):

> At about 5:30 in the morning, I was at the State Police barracks handling some paperwork, and I received a call from the Village of Wappingers PD, and they stated to me that a gun they recovered from the robbery that night had a serial number that matched the number that was entered into the Statewide computer on Friday from a burglary that we had.

However, the essence of that testimony (that the serial number on the gun recovered from the robbery matched the serial number of gun stolen in a burglary being investigated by the State Police) had already been established through the testimony of Geoff Weaver and John Villani. Geoff Weaver testified that he inventoried a .22 caliber handgun that had been recovered from the van that had crashed, and identified Exhibit 20 as that handgun (T. 34-37). John Villani testified that he was the licensed owner of a .22 caliber handgun that had been stolen from his home, that the State Police responded to his home to investigate the burglary and that the serial number on Exhibit 20 matched the serial number on his handgun that had been stolen (T. 39-43). Accordingly, there is no reasonable probability that the result of petitioner's trial would have been different even if the contested hearsay testimony had been deemed inadmissible upon defense counsel's objection.

Petitioner also argues that trial counsel was ineffective for failing to object to Detective Novick's testimony about petitioner's statement that "he wanted to make a deal." Contrary to petitioner's assertion, trial counsel did, in fact, object (T. 216-17):

> Q. Did you ask him other questions besides what is known as pedigree information?

A.  No.

Q.  Did he make any other statements to you that morning?

A.  He wanted to make a deal.

Q.  To the best of your recollection, what did he say?

> Miss Kilpatrick:  Objection.
> The Court: What is your objection?
> Miss Kilpatrick: Did he make any statements, and he said he
wanted to make a deal.  That is not a statement.
> The Witness: He said that he . . .
> The Court: To that extent – don't characterize what you think he
was doing, just say what he said.

Further, petitioner argues that trial counsel was ineffective for failing to object to Gloria

Kiss' testimony about the lasting effects of the robbery on her well-being (T. 283):

Q.  Have you been able to work since that night?

A.  No.

Q.  Why not?

A.  I can't.  I don't sleep since that night, I don't work since that night.

Q.  Why can't you sleep?

A.  I can't sleep because every night this robbery replays in my head over
and over and over.

Q.  And do you see the events in your head every night?

A.  Every night.

Petitioner fails to demonstrate that he was prejudiced by this testimony.  The challenged

statements were inconsequential in the context of the entire trial and in light of the

overwhelming evidence of petitioner's guilt.  Moreover, they supported defense counsel's

argument in summation that Ms. Kiss' testimony was unreliable because she was terrified by the

robbery, she was in a state of shock and was still traumatized at the time of trial (T. 435-36, 439-440, 444).

Petitioner additionally complains that defense counsel should have objected to Detective Novick's testimony that petitioner was the man he saw in the picture (in the apartment), because the picture was not in evidence.  Petitioner's argument holds no water: there is no rule which requires introduction into evidence of every tangible thing about which a witness testifies.  Therefore, it was not objectively unreasonable for defense counsel to refrain from objecting to the challenged testimony.  Further, defense counsel attacked Detective Novick's testimony on summation, arguing that there was "no evidence as to the identity of the person in the photograph" and, therefore, that Detective Novick's testimony that petitioner was the man in the photo was "speculation" and "an assumption."  T. 462, 464.  In light of the overwhelming evidence of petitioner's guilt, he was not prejudiced by counsel's alleged failures in this respect.

Finally petitioner alleges that trial counsel was ineffective for failing to object to Eulis Jarratt's testimony that petitioner entered a house to steal guns and to John Villani's testimony about a "completely unrelated" burglary.  However, as discussed above, Eulis Jarratt's testimony about the burglary was relevant to the charge of criminal possession of stolen property; John Villani's testimony was relevant to the same count, and dove-tailed with Eulis Jarratt's testimony that petitioner entered a residence on Sherwood Heights (the road on which Villani lived) and came out with two suitcases containing two handguns (T. 38, 42-43, 66).  Thus, it was clearly reasonable for defense counsel to refrain from objecting to the challenged testimony under the assumption that it was relevant and admissible and, therefore, that any objection would be overruled.

In sum, the Second Department's rejection of petitioner's ineffective assistance of trial

counsel claim was neither contrary to, nor an unreasonable application of, clearly established

federal law.  Accordingly, I conclude and respectfully recommend that petitioner's ineffective

assistance of trial counsel claim is meritless and must be dismissed.

   2. *Appellate Counsel*

   In his fourth claim for habeas relief, petitioner contends that his appellate counsel was

ineffective because (1) he failed to fully articulate the underlying facts in support of petitioner's

claims on direct appeal, which required petitioner to submit a supplemental brief to the state

court, and (2) he failed to argue on direct appeal that trial counsel was ineffective for failing to

protest that the public was excluded during jury selection.  Ineffective assistance of appellate

counsel claims "are deemed exhausted upon the filing and disposition of a petition for writ of

error coram nobis."  Williams v. Goord, 277 F. Supp.2d 309, 321 (S.D.N.Y. 2003).

   Here, although petitioner filed a writ of error coram nobis, it was premised solely upon

petitioner's second argument (appellate counsel's failure to argue on direct appeal that trial

counsel was ineffective for failing to protest the public's exclusion from jury selection).  See

Supp. App., Exh. 27.  Therefore, petitioner's first ground for his ineffective assistance of

appellate counsel claim–that petitioner was forced to submit a *pro se* supplemental brief on

direct appeal because appellate counsel's brief was deficient–is unexhausted but cannot be

deemed exhausted because it could be raised in a successive coram nobis application.  See

Dominique v. Artus, 25 F. Supp.3d 321, 339 (E.D.N.Y. 2014).  The instant petition is thus a

"mixed petition" containing this unexhausted claim as well as all of the other exhausted claims.

See Rhines, 544 U.S. at 271.  This Court may review and deny a mixed petition containing both

exhausted and unexhausted claims, if those unexhausted claims are "plainly meritless."  See 28

U.S.C. § 2254(b)(2); Rhines, 544 U.S. at 277-78.  Petitioner's unexhausted ineffective assistance

-58-

of appellate counsel claim is plainly meritless.  He submitted a detailed and thorough *pro se*

supplemental brief which the Appellate Division specifically considered.  People v. Shaw, 83

A.D.3d at 1103, 922 N.Y.S.2d at 173 ("The defendant's remaining contentions, including those

raised in his pro se supplemental brief, are without merit.").  Thus, petitioner fails to demonstrate

the requisite prejudice because he raised all of the arguments he contends appellate counsel

should have raised, and the Appellate Division rejected them.  To the extent petitioner asserts

that the Appellate Division gave less consideration to his "layperson" arguments, he has

presented no evidence to support such an assumption.  Accordingly, because this unexhausted

claim is plainly meritless, I respectfully recommend (despite petitioner's failure to exhaust this

claim) that Your Honor should dismiss it on its merits pursuant to 28 U.S.C. § 2254(b)(2).  See

Rhines, 544 U.S. at 277-78.

       As to the claim raised in petitioner's coram nobis application (that appellate counsel was

ineffective for failing to argue on direct appeal that trial counsel was ineffective for failing to

protest the public's exclusion from jury selection), the Second Department rejected that claim on

its merits.  People v. Shaw, 112 A.D.3d 974, 976 N.Y.S.2d 891 (2d Dep't 2013).  Accordingly,

on habeas review, I must apply the deferential AEDPA review standard in evaluating petitioner's

exhausted ineffective assistance of appellate counsel claim.  See Sellan, 261 F.3d at 312.

       Jury selection commenced on November 9, 2005 (JS 2).[21]  After discussing pretrial issues

in open court (JS 2-15), the jury panel was brought into the courtroom and sworn in (JS 15-16).

The Court gave preliminary instructions to the panel (JS 16-22), and then explained (JS 22-23):

       At this time, I am going to go through a series of questions with all of you.

---

[21]  Numbers in parentheses preceded by "JS" refer to pages from the transcript of the jury
selection.

> As I go through these questions, I would ask you to please raise your hand if they are applicable to you and give us your juror number. When we have concluded these preliminary questions, we will then talk to you individually to determine whether there is any difficulty in your continuing to be a potential juror in this case. I just find people are more comfortable and candid – some of these questions are somewhat innocuous and some may not be, but I find that people are more comfortable if you speak to us individually. Rather than have you stand here in the Courtroom and answer these questions or discuss things with me, I will ask the questions, simply take down all of your juror numbers, and then we will talk to you one at a time in the conference room behind the courtroom.

In accordance with this procedure, the trial court ascertained whether any members of the panel had availability issues (JS 25-26), knew any of the attorneys or the defendant or potential witnesses (JS 26-27), had any knowledge of the case (JS 27-28), had connections with law enforcement, the District Attorney or a police agency (JS 28-30), had ever been arrested or accused of a crime (JS 30-31) and whether they had ever been the victim of a crime or a witness at a trial (JS 31). The trial court recorded the juror numbers of those who gave positive responses; after some additional preliminary instructions (JS 32-36)– during which two members of the venire indicated they had something they wished to discuss (JS 36)–the court began questioning jurors in the conference room (with counsel and petitioner present) about the specific concerns they had raised in the courtroom (JS 40-109). After questioning twenty-five members of the venire in this manner, the trial court adjourned (JS 109-110).

The court reconvened on November 10, 2005 and resumed questioning jurors in the conference room (with counsel and petitioner present) (JS 111-186). At the completion of this process, the proceedings returned to the courtroom (JS 186); sixteen names were drawn and those selected were seated in the jury box (JS 187-88), after which court was adjourned (JS 192).

Court resumed on November 14, 2005 (JS 193). In open court, the sixteen prospective jurors each gave biographical information and were questioned by counsel (JS 193-224). The

proceedings were then moved into the conference room (with counsel and petitioner present), to address a potential juror conflict (JS 225-229) and to ascertain peremptory challenges and challenges for cause (JS 230-31).  The proceedings returned to the courtroom and the challenged jurors were excused (JS 231-32) and eight jurors were sworn and returned to the jury room (JS 232-33).  Sixteen additional names were called and those prospective jurors were seated in the jury box (JS 233).  A second round of jury selection was conducted in open court in the same manner as the first (JS 233-65).  Counsel, petitioner and the court met once more in the conference room to discuss challenges (JS 266-276).  The proceedings returned to the courtroom, and the court excused the challenged veniremen and swore in the remaining jurors and the alternates (JS 276-77).

Petitioner now complains that trial counsel should have objected to portions of the voir dire being conducted in the conference room.  He makes this argument in the context of his ineffective assistance of appellate counsel claim, *to wit*: appellate counsel was ineffective because he did not assert on direct appeal that trial counsel was ineffective for failing to object to the voir dire proceedings.  In other words, the ultimate issue here is whether appellate counsel was ineffective for failing to argue that trial counsel was ineffective.  That question depends on whether trial counsel was ineffective for failing to object to the voir dire proceedings.

Petitioner hinges his argument on the Supreme Court's decision in Presley v. Georgia, 558 U.S. 209, 213 (2010), wherein the Court held that the right to a public trial extends to the voir dire of prospective jurors.  Petitioner contends that, because *Presley* was decided during the pendency of his direct appeal, appellate counsel should have relied upon it for the proposition that trial counsel was ineffective.  Petitioner's argument fails, however, because he cannot satisfy *Strickland*'s first prong.  In the first place, *Presley* is not directly on point: the issue in

-61-

*Presley* was exclusion of the public from the *entire* voir dire, over defense counsel's objection. See Presley, 558 U.S. at 210.  Here, in contrast, only a *portion* of the voir dire was conducted in the conference room.  Furthermore, *Presley* was decided more than four months *after* appellate counsel filed his brief (Exh. 17, at 53).  "An attorney is not required to forecast changes or advances in the law."  Sellan, 261 F.3d at 315 (quotation and citation omitted).  Here, even if appellate counsel believed that *Presley* governs the instant case, it was not unreasonable for him to refrain from arguing (in a supplemental submission) that trial counsel was ineffective, because *Presley* was not decided until more than *four years after* trial counsel participated in the jury selection.  Trial counsel's performance must be assessed "on the basis of the facts of the particular case viewed as of the time of counsel's conduct " without the benefit of hindsight.  Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (quoting Strickland, 466 U.S. at 690).  Here, without the benefit of hindsight, it is impossible to conclude that trial counsel was ineffective for failing to object to the voir dire proceedings.  Thus, because appellate counsel was not ineffective for failing to argue that trial counsel was ineffective, the Second Department's rejection of petitioner's exhausted ineffective assistance of appellate counsel claim was neither contrary to, nor an unreasonable application of, federal law.  Accordingly, I conclude and respectfully recommend, that petitioner is not entitled to habeas relief on the ground of ineffective assistance of appellate counsel.

H.  Cumulative Errors (Ground 2(c))

        As part of his second claim for habeas relief, petitioner contends that he was deprived of a fair trial due to the cumulative effect of prosecutorial misconduct and the ineffective assistance of trial counsel.  Petitioner exhausted this claim on direct appeal; the Second Department summarily rejected this claim.  People v. Shaw, 83 A.D.3d at 1103, 922 N.Y.S.2d at 173 ("The

defendant's remaining contentions, including those raised in his pro se supplemental brief, are without merit."). Accordingly, on habeas review, I must apply the deferential AEDPA review standard in evaluating petitioner's "cumulative errors" claim. See Hawthorne, 695 F.3d at 196.

"Habeas relief may be justified based on the cumulative effect of errors that, standing alone, would not warrant the granting of a new trial. But implicit in such a claim is, first, that the alleged individual errors a petitioner seeks to aggregate are actually errors." Joyner v. Miller, No. 01 Civ. 2157, 2002 WL 1023141, at *13 (S.D.N.Y. Jan. 7, 2002) (internal citation omitted). "In addition, the cumulative errors must be so prejudicial that they rendered petitioner's trial [ ] fundamentally unfair." Diaz v. Graham, No. 07 CV 5379, 2010 WL 6428635, at *13 (E.D.N.Y. July 13, 2010) (Report and Recommendation), adopted by 2011 WL 1303924 (E.D.N.Y. Mar. 31, 2011). The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." Dowling v. United States, 493 U.S. 342, 352 (1990).

Here, for the reasons set forth above, petitioner fails to establish any actual error. Further, consideration of the record as a whole demonstrates that petitioner received a fundamentally fair trial. The Second Department's rejection of petitioner's "cumulative errors" claim was, therefore, neither contrary to nor an unreasonable application of federal law. Accordingly, I conclude and respectfully recommend that petitioner is not entitled to habeas relief on the ground that he was denied a fair trial as a result of cumulative errors.

# V. CONCLUSION

For the reasons set forth above, I conclude—and respectfully recommend that Your Honor should conclude—that the instant petition for a writ of habeas corpus should be denied in

its entirety.  Further, because reasonable jurists would not find it debatable that petitioner has

failed to demonstrate by a substantial showing that he was denied a constitutional right, I

recommend that no certificate of appealability be issued.  See 28 U.S.C. § 2253(c); Slack v.

McDaniel, 529 U.S. 473, 483–84 (2000).


Dated:   November 12, 2015                              Respectfully Submitted,
              White Plains, New York

_____
              PAUL E. DAVISON, U.S.M.J.


# NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days, plus an additional three (3) days, or a total

of seventeen (17) days, from service of this Report and Recommendation to serve and file

written objections.  See also Fed. R. Civ. P. 6(a), (b), (d).  Such objections, if any, along with

any responses to the objections, shall be filed with the Clerk of the Court with extra copies

delivered to the chambers of the Hon. Kenneth M. Karas, at the Hon. Charles L. Brieant, Jr.

Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York

10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later

appellate review of any order of judgment that will be entered.  See Caidor v. Onondaga County,

517 F.3d 601, 604 (2d Cir. 2008).

Requests for extensions of time to file objections must be made to Judge Karas.

A copy of this Report and Recommendation has been mailed to:

Norman Shaw, #06-A-2639
Shawangunk Correctional Facility
P.O. Box 700
200 Quick Road
Wallkill, New York 12589